Jones, Chief Judge,
delivered the opinion of the court:
This is an appeal bj the Ottawa Tribe from the final award of the Indian Claims Commission (hereinafter referred to as the Commission) entered November 26, 1962. 11 Ind. Cl. Comm. 577a (Docket No. 303).[1] Appellant claims that certain items of the damages awarded by the Commission are insufficient, and that additional elements of damages, to be measured by the appropriate rates of interest, should be allowed. Although appellee also filed a notice of appeal, that cross-appeal must be considered abandoned since appellee now urges us to affirm the decision below.
*375 By tbe Treaty of August 30,1831, 7 Stat. 359, the United States conveyed to the Ottawas a 75,000-acre reservation in what is now Franklin County, Kansas. During the 1850’s, the United States negotiated with the Indian tribes west of the States of Missouri and Iowa to obtain Indian lands for the settlement of citizens thereon. By a Treaty of June 24, 1862, 12 Stat. 1237, the Ottawas agreed to dispose of their reservation by special grants and allotments to all members of the tribe but to reserve 20,640 acres to endow permanently a school for the Ottawas (the so-called “school lands”) and 30,000 acres which were to be sold by the Indian Agent in trust for the Ottawas (the so-called “trust lands”). The school lands and the trust lands are the subject of the present controversy.
Under the 1862 treaty the 20,640 acres of school lands were to be disposed of by reserving 640 acres for the school-site, by selling 5,000 acres to provide funds for the construction of the school, and by selling the remaining 15,000 acres to provide an endowment for the school. The treaty provided for a board of seven trustees to manage the school. This board was to be composed of four Indians and three white citizens. The trustees were empowered to fill vacancies in the board, but the presence of two white trustees was required for the transaction of business by the trustees. Four Indians and John Pratt, a white citizen, were named in the treaty as trustees. The Indian trustees thereafter elected the United States Indian Agent for the Ottawas, C. C. Hutchinson, and Hutchinson’s father-in-law, John Young, as the two additional trustees. Young was soon replaced as a trustee by one Kalloch.
Before Young was replaced by Kalloch, the school board contracted to sell to Young the 5,000 acres of school lands for $1.25 per acre. Young subsequently conveyed 640 acres, which later became the townsite, to Hutchinson for $800 and assigned the remaining 4,350 acres to Kalloch.
Kalloch and Hutchinson were president and vice-president, respectively, of both a “Roger Williams University” and the Ottawa Town Company (hereinafter referred to *376 as the Company). The Commission has found that the “Roger Williams University” was an institution on paper only, with no tangible assets, and with few prospects unless lands were obtained from the Ottawas. The name of this “Roger Williams University” was soon changed to Ottawa University which became the school endowed by the provisions of the 1862 treaty. It can also be gathered, from the record, that the primary objective of the Company, in its transactions connected with the present case, was the real estate speculation with Ottawa lands.[2]
According to the deed records, Hutchinson conveyed the 640-acre townsite to the Company for a stated consideration of $10,000. The Company then divided the townsite into lots which were sold at varying prices, conveyed for other consideration or given away to aid development. Appellant alleges that the townsite was divided into about 4,100 town lots of which 40 lots were sold to pay taxes on the property; 500 lots were given to Franklin County for $2,680 for developmental purposes; 147 lots were transferred for $3,000 to Commissioner of Indian Affairs, William P. Dole, who negotiated the 1862 treaty with the Ottawas; 2,285 lots were transferred to shareholders of the Company at a total recited consideration of $36,675; and the remaining 1,178 lots sold to bona fide purchasers. The parties have stipulated that the total consideration received by the Company for the 4,100 lots was $116,172.68.
In 1865, Kalloch sold to Richard D. Lathrop, a member of the Company, an undivided one-half interest in the 4,350 acres, which Kalloch obtained as assignee of Young, for the sum of $4,000. Between 1865 and 1871, over 4,000 acres of this land were sold to the public for $43,537.03. The remainder of the 4,350 acres, which were unsold as of 1871, had a value of $3,151.59.
Of the so-called school lands, there remained the 15,000 acres which were intended to be an endowment for the school. The Commission found that these 15,000 acres were dissipated through various means and that the Indians only received $4,934.25 from the proceeds of sale of this tract of land.
*377 As to the so-called trust lands, it was found that Hutchinson had not turned over to the Government $30,603.94, which sum he had received from the sale of some 22,000 acres of trust lands. The remainder of these trust lands was conveyed to the Ottawa University, under the provisions of a Treaty of February 23, 1867, 15 Stat. 513, 517, at the 1864 appraised value of $13,532.22. By 1872, the University had realized over $35,000 from the resale of the land so obtained.
Appellant’s petition before the Indian Claims Commission, filed pursuant to the Indian Claims Commission Act § 2, 25 U.S.C. § 70a, prayed for judgment for the net proceeds obtained by the school trustees from the sales of lands conveyed to such trustees and for the value of the part of such lands never sold by these trustees, and for such other and further relief as the Commission might deem just.
The Indian Claims Commission found that the Ottawas were not sufficiently advanced to cope with the business world, and that there was a moral obligation on the part of the United States to check thoroughly the Indians’ ability to face the responsibility of administering a trust, and to provide ample safeguards in the treaty for the supervision and accountability of the trustees so as to prevent mismanagement. The Commission, therefore, concluded that the United States was liable to appellant for “whatever profit, based on bona-fide first sales, that was made by Hutchinson and Kalloch” on the resale of the approximately 5,000-acre tract. In computing the amount of damages, the Commission regarded the sale by Hutchinson to the Company of the 640-acre townsite and the sale by Kalloch to Lathrop of half interest in the 4,350-acre tract as bona fide. With respect to the 640-acre townsite, the Commission awarded appellant $9,200, which is the difference between the $10,000 paid by the Company and the $800 paid by Young. As to the 4,350-acre tract, the Commission awarded appellant one-half of the amounts realized by Kalloch and Lathrop from sale of this land. The Commission also awarded appellant the $30,603.94, plus interest, which was unaccounted for by Hutchinson after part of the trust lands was sold by him. The Commission’s final award also included several other items which are not here in dispute.
*378 Appellant contends that the following modifications of the Commission’s final award should be adopted by this court:
(A) To increase the award with respect to the profit upon the sale of the townsite from $9,200 to $225,749.98, because the sale from Hutchinson to the Company (and some of the resale by the Company) was not bona fide.
(B) To increase the award with respect to the sale of 4,350 acres of school lands from $21,894.31 to $50,713.62, because the sale from Kalloch to Lathrop was not bona fide.
(C) To add an amount of $19,466.76 as additional damages, plus interest, representing the profit made by the University with respect to the trust lands conveyed to the University under the 1867 Treaty.
(D) To award additional damages, to be measured by appropriate interest rates, on that portion of the award which represents the proceeds of the sale of the 15,000 acres intended as an endowment for the school.
We conclude that appellant has not made out its case with respect to the last three contentions above. Therefore, we affirm the final award with respect to these items, based on the reasons adequately stated in the opinions of the Commission below.[3] However, we are in substantial agreement with appellant’s first contention in that the sale from Hutchinson to the Company was not a bona fide transaction.
The Commission has held that the United States is liable to appellant for “whatever profit, based on bona-fide first sales, that was made by Hutchinson and Kalloch” on the resale of the 5,000-acre tract which included the townsite. Appellant does not dispute this holding but contends that the Commission’s conclusion, that the sale by Hutchinson to the Company of the 640-acre townsite was a bona fide transaction, is not warranted. We think that appellant is correct in its contention. The Commission said that the fact that Hutchinson was an officer of the Company falls far short of imputing any cloud upon the transaction, and that the $10,000 consideration paid by the Company for the 640 acres may well have been the fair market value of the unimproved *379 townsite. That may be so, but a person having notice of breach of trust by his transferor is not a bona fide purchaser. Kestatement (Second), Trusts § 288 (1959). We believe that the Company had actual or constructive notice of the breach of trust committed by Hutchinson before the transfer in question.
The Company itself was formed to exploit the lands of the Indians, and it knew that these were Ottawa lands. The Company, or its agents, knew, or should have known, that Hutchinson was the Indian Agent. Therefore, it was incumbent upon the Company, or its agents, to make inquiries when the Indian Agent in his personal capacity, and not as an agent of the Government, conveyed Indian land to the Company. Had the Company made inquiries with respect to this land, we have no doubt that the Company would have found that Hutchinson breached his trust by making huge profits in dealing with trust property. The general rule is that a person has notice of a breach of trust if he knows, or should know, of the breach of trust. Kestatement (Second), Trusts § 297(a) (1959). Under these circumstances, we hold that, as a matter of law, the Company was not a bona fide purchaser.
The law frowns upon anything that bears any semblance to a conflict of interest. This is especially true where there is a trust relationship. The law is even more exacting where there is a relationship akin to that of guardian and ward. That no man can serve two masters is gospel as well as law. It is true in life as in law. There can be no halfway ground. This rule is as exacting as arithmetic which was referred to by an ancient philosopher as “the first of the sciences and the mother of safety.”
Involved here are three men all of whom occupied a trust relationship and one of them represented the Government in its dealings with the Indians. They organized a townsite Company of which they owned a substantial part and which they operated. They first sold through an intermediary the planned townsite location of 640 acres for the price of $800 to one of the trustees who was the Indian Agent employed by the Government. He soon transferred that tract to the townsite Company for a consideration of $10,000. The Com *380 pany, in turn, sold tlie lots at a profit of many times the original cost.
Who should retain these profits? The appellee says the profits belonged to the townsite Company. It claims the Company paid the full value of the property at the time of the sale. But whether or not this was true, the question arises: Did the trustees, who were also officials of the Company, know something the public generally did not know? And did they learn these prospects while in their representative relationship with the tribe and the Government? Surely their position must have contributed to that knowledge. The facts preclude any other reasonable conclusion. Does anyone'believe that they would have organized the Company and made these profits, but for the knowledge and prospects gleaned from that relationship?
The law requires what is called uberrima fides, the highest good faith, in matters of this kind. There can be no shading. This is not a sudden turn in the law. It is based upon centuries of human experience. The principle has been a gradual growth. It recognizes the frailties of human nature and curtains off any possibility of personal profit from such a confidential relationship. There is thus a basic reason for applying this principle of law. It has been found, through these years of revealing experience and continuing effort to perfect the law, that the only practical way to assure proper operation is to foreclose any possibility of the trusted representative’s making a personal profit out of transactions that are linked directly or indirectly to such a relationship. They are limited to the allowance of reasonable pay for work actually performed under the assignment.
The parties have stipulated that the total consideration received by the Company, from the sale of the townsite, was $116,172.68. Appellant is, therefore, entitled to a judgment of $115,372.68 ($116,172.68 minus the $800 already paid to the school board) with respect to the townsite.
Appellant is not satisfied with the above judgment but contends that the considerations paid to the Company by two groups of purchasers were not adequate, and that the beneficiaries of the school trust were entitled to recover the value of the land in the hands of a transferee who is not a bona fide purchaser. The records show that 147 lots were trans *381 ferred for $3,000 to the Commissioner of Indian Affairs, William P. Dole, who negotiated the 1862 treaty with the Ottawas, and 2,235 lots were transferred to shareholders of the Company at a total recited consideration of $36,615. It is the appellant’s position that the transfers of lots to shareholders were not sales at all but in effect divisions of the assets of the Company among its shareholders, and that the transfer of lots to Dole was a highly questionable transaction by a Government official which prevents us from being able to determine whether that transaction was fair or not. Appellant contends that an amount, which is the difference between the $39,675 paid for the 2,382 lots and the then fair value of these lots, should be added to the total consideration received by the Company.
While transactions of this type may in some instances be questionable depending on the facts and circumstances of a particular case, we conclude that appellant has not carried its burden of demonstrating to us that the determination of the Indian Claims Commission was erroneous in this case. Accordingly, appellant is not entitled to more than the $115,372.68 with respect to the townsite.
The opinions and final award of the Indian Claims Commission are affirmed in part and reversed in part. Appellant is entitled to a judgment of $115,372.68 with respect to the townsite (corresponding to Item 7 of the final award of the Commission). As thus modified, the decision of the Indian Claims Commission is affirmed, and the case is remanded to the Commission for the entry of an appropriate order.

Affirmed in part and reversed in part.

 The findings of fact by the Commission are reported in 8 Ind. Cl. Comm. 831-873 (1960) and in 11 Ind. Cl. Comm. 550-565 (1962). The opinions of the Commission may he found in 8 Ind. Cl. Comm. 874-899 (1960) and in 11 Ind. Cl. Comm. 566-577 (1962).

 8 Ind. Cl. Comm. 879-880 (1960).

 8 Ind. Cl. Comm. 874 (1960) and 11 Ind. Cl. Comm. 566 (1962).