383 F.2d 991
 The SAC AND FOX TRIBE OF INDIANS OF OKLAHOMA et al., the Iowa Tribe of the Iowa Reservation in Kansas and Nebraska, the Iowa Tribe of the Iowa Reservation in Oklahoma et al.
v.
The UNITED STATES.
 Appeal No. 9-65.
 United States Court of Claims.
 Decided March 17, 1967.
 
 George B. Pletsch, Chicago, Ill., attorney of record for the Sac and Fox Tribes, appellants. Schiff, Hardin, Waite, Dorschel & Britton, Stanford Clinton, Lawrence C. Mills & Garrett, Chicago, Ill., and Louis L. Rochmes, Washington, D. C., of counsel.
 Nicholas Conover English, Newark, N. J., attorney of record for the Iowa Tribes, appellants. Brian Sullivan, Dykema, Wheat, Spencer, Goodnow, & Trigg, Detroit, Mich., McCarter & English, Newark, N. J., and Louis L. Rochmes, Washington, D. C., of counsel.
 Walter J. Muir, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for appellee.
 Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.
 OPINION
 SKELTON, Judge.
 
 
 1
 The appellants, the Iowa Tribe of the Iowa Reservation in Kansas and Nebraska, and the Iowa Tribe of the Iowa Reservation in Oklahoma (hereinafter called the "Iowa"), are the sole successors in interest to the Iowa Nation of Indians and bring this suit on behalf of said nation and all its members.
 
 
 2
 The appellants, the Sac and Fox Tribe of Indians of Oklahoma, the Sac and Fox Tribe of Missouri, and the Sac and Fox Tribe of the Mississippi in Iowa (hereinafter called the "Sac and Fox"), each represented by individual members of the respective tribes, are the sole successors in interest to the rights of the Sac and Fox Nation. They maintain this suit on behalf of said nation and all of its members.
 
 
 3
 This is an appeal from decisions of the Indian Claims Commission[1] which held that:
 
 
 4
 (1) The Iowa held original Indian title to 1,551,200 acres of land in northwestern Missouri in what is designated on Royce's maps of Indian land cessions as Area 69 (sometimes called Cession 69),[2] which was part of the area ceded to the United States pursuant to the Treaty of August 4, 1824;[3] and the sum of $19,846.23 paid to them by the Government was an unconscionable consideration for the land; and the fair market value of the ceded Indian lands as of January 18, 1825 (the effective date of the treaty) was 45 cents per acre or the total sum of $698,040, which the Iowa were entitled to receive, less allowable offsets in the sum of $45,000 and less the amount of $19,846.23 already paid, making the net amount to be paid the sum of $633,193.77.
 
 
 5
 (2) The Sac and Fox held original Indian title to 1,241,700 acres of land in northeastern Missouri in Area 69, which was part of the land ceded to the United States in the Treaty of 1824; and the $27,799.61 paid to them by the Government was an unconscionable consideration for the land; and the fair market value of their aboriginal lands as of January 18, 1825 (the effective date of the treaty), was 80 cents per acre or the total sum of $993,360, and accordingly, they should be paid such amount less the sum already paid, making the amount due the sum of $965,560.39.
 
 
 6
 (3) The Sac and Fox did not have recognized title to any of the land by reason of the Treaty of 1804 (7 Stat. 84) or any other treaty or act.
 
 
 7
 (4) The claims of both tribes that they held original title to additional lands in Area 69 were rejected.
 
 
 8
 (5) The Iowa were not entitled to a higher market value than 45 cents per acre for their aboriginal land.
 
 
 9
 (6) There was no "constructive trust" existing in favor of the tribes because of an alleged fiduciary relationship between them and the Government, or for any other reason, which entitled them to be paid whatever profit it made when it later sold the land.
 
 
 10
 (7) The tribes were required to prove they had aboriginal title to their lands in 1803, and held such title until the date of the Treaty in 1824; and no evidence of Indian title acquired after 1803 could be considered because the Government acquired the sovereign title to all of the land in that year from France by the Louisiana Purchase.
 
 
 11
 The claims of both the Iowa and the Sac and Fox were tried together by the Indian Claims Commission and will be disposed of together in this appeal.
 
 
 12
 In this case both the Iowa and the Sac and Fox contend that: they held aboriginal title to more land than was awarded to them and consequently they were entitled to larger awards; because of the fiduciary relationship existing between them and the Government, a "constructive trust" was created under clause (2), section 2 of the Indian Claims Commission Act[4] which entitled them to the profit made by the United States when it later sold the land, or, in the alternative, clause (5), section 2 of the Act relating to fair and honorable dealings entitled them to such profits; and the Commission erred when it required them to prove aboriginal title as of 1803, the date of the Louisiana Purchase, instead of 1824, the date of the Treaty.
 
 
 13
 In addition, the Iowa say that the land awarded to them should have been valued at 80 cents per acre instead of 45 cents; and the Sac and Fox allege that their award should be based on their title which was recognized by the United States in the Treaty of November 3, 1804,[5] instead of on aboriginal title.
 
 
 14
 Before discussing the issues, perhaps it would be well to describe briefly the background, history, way of life and geographical locations of the Iowas and the Sac and Fox tribes.[6] This should be particularly helpful in connection with their claims to land based on Indian or aboriginal title. Accordingly, for the sake of brevity, we set forth below the background description, location, and movements of these tribes prior to 1824, as made by the Indian Claims Commission, with such changes and additions as the record justifies.
 
 
 15
 * The Iowa Nation of Indians, one of the "Chiwere" groups of the Sioux linguistic stock with a close affinity to the Otoe and Missouri Indians originally came from east of the Mississippi. Early reports place the Iowa in the last seventeenth century around the Lake Okeboji region in northwestern Iowa and southwestern Minnesota. Sometime around the middle of the eighteenth century they departed this area and moved in a southerly direction down the Missouri River into the southwestern part of Iowa where they established a village just south of the present city of Council Bluffs, Iowa. From this village site, which is located northwest of Cession 69, the Iowa hunted the area southward along the Missouri River and east toward the western boundary of Cession 69. During this period this same area, which for the most part lies west and north of Cession 69, was utilized for hunting purposes by other Indian tribes such as the Omaha or Mahas, the Otoes and Missouris.
 
 
 16
 Sometime between 1755 and 1765, the Iowa Nation abandoned the village site at Council Bluffs, and moved slowly eastward across the southern part of Iowa to the Mississippi River, where eventually it chose to settle at a more permanent village site on the Des Moines River approximately 120 miles from the mouth of the Des Moines. This village lying north of Cession 69 is the best documented of all the Iowa village locations and the one which remained a principal Iowa village site during the years that followed until about 1823.
 
 
 17
 Two principal factors are attributed to the general exodus of the Iowa Nation from the Council Bluffs area. In the first place, the Iowas were being constantly harassed by their inveterate enemies from the north, the war-like Sioux, who were pressing from the northern plains and conducting extended forays into the western part of Iowa. Of greater moment was the fact that the Iowas desired closer contact with their Spanish and French traders whose operations were centered primarily in St. Louis. With the rapid growth of Indian trading activity, those tribes, including the Iowas, who inhabited this region became more dependent for the simple necessities of life upon what they could barter with furs and skins. Thus, the period throughout the latter part of the 1700's and into the nineteenth century was marked by an awesome exploitation of many choice hunting grounds coupled with bloody and indecisive fights among competing tribes in search for new and more fertile hunting spots.
 
 
 18
 Having adapted themselves to the use of the horse, the Iowas hunted extensively west and southwest of their Des Moines River location across the southern part of Iowa to the Missouri and down into their old Council Bluffs hunting grounds, and in the plains between the Grand and Chariton Rivers toward their headwaters.
 
 
 19
 The Indian Claims Commission found as a fact in a prior case as follows:
 
 
 20
 32. During the period from approximately 1765 to 1812, the Iowa Nation hunted for furs in their traditional hunting grounds to the southwest of Cession 175 and these traditional hunting grounds were bounded as follows:
 
 
 21
 On the east by the watershed between the Grand and Chariton Rivers; on the south by the Missouri River; on the west by the Missouri River up to the western watershed of the Nodoway River and then by the watershed between the Nodoway and Nishnabotna Rivers; and on the north by the Des Moines River. [The Sac and Fox Tribe of Indians of Oklahoma v. United States, Docket No. 158, 5 Ind.Cl. Comm. 367, 379 (1957).]
 
 
 22
 The record is replete with evidence that during the period from 1800 to 1824, the Iowas hunted over the entire western part of Area 69 (Cession 69) extending from the watershed between the Grand and Chariton Rivers on the east to the Missouri, Nodoway and Nishnabotna Rivers on the west, and from the Des Moines River on the north to the Missouri River on the south. Much of the evidence indicates they had villages scattered throughout this area during this period, although some of them were moved about from time to time. By 1800, they had driven the Missouris, Osage and Kansas Indians out of this entire territory and were in complete control of the land north of the Missouri River. Much of this evidence was obtained from statements, records and quotations from explorers, generals, governors, historians and others who visited or lived in the area during this period.
 
 
 23
 At the outbreak of the War of 1812 with Great Britain, the United States, through the offices of William Clark, Governor of this territory, invited the Iowans, as well as the Sac and Fox Indians, to leave their Mississippi and Des Moines River sites, and travel south and west across to the Missouri River. The obvious purpose of Clark's move was to place these Indians outside of the scope of British influence and separate them from their pro-English brethren. Shortly thereafter, the Iowans temporarily removed from their Des Moines River site and filtered down to the south and southwest toward the Missouri River. Other members of the Iowa nation moved across to the Missouri where they joined with the Otoes and the Missouris. With the influx of these Indians into Cession 69, there developed agitation and hostility between the red men and the white settlers who were spotted along both sides of the Missouri River west of the Mississippi. Roving bands of Iowas and Sac and Fox found occasion to renew hostilities with the Osage. It was not until after the War of 1812 that the Iowas, who were now greatly divided, began to reassemble as a nation. Around 1820, they were reported back at their old Des Moines River site but then abandoned it and built a new village on the Grand River in 1823, where the whole nation was reported to be living at one time. After negotiating the Treaty of August 4, 1824, the Iowas remained within Cession 69 only a short period and in 1827 they finally moved to a new village site on the Little Platte River, west of Cession 69. Throughout the period of their known history, the estimated population of the Iowa Nation rarely exceeded 1,000 persons.
 
 
 24
 These facts would seem to justify an examination of the evidence to determine whether or not at the time of the Treaty of 1824, the Iowa had actually, exclusively, and continuously used and occupied for a long time the western part of Cession 69 described above.
 
 II
 
 25
 Originally the Sac and Fox Nation consisted of two separate and identifiable tribes of Indians belonging to the Algonquin stock. Around 1735, due to their mutual hostility and conflict with the French, they formed a close and intimate alliance, politically and socially, so that from thence forward they have been dealt with and referred to as a single nation both in their relationship with the other Indian tribes and in treaty negotiations and other matters with the United States.
 
 
 26
 It was shortly after this merger that the members of the Sac and Fox Nation began to establish themselves in Iowa. They maintained for many years and on into the 1800's several separate but permanent villages constructed along and on both sides of the Mississippi River, from as far up as the Prairie du Chien and Turkey River area, to as far down as the mouth of the Missouri River. For the most part of the Fox Indians occupied the upper villages and the Sac Indians the lower villages, including the small village near the mouth of the Des Moines River. The principal Sac and Fox village sites prior to 1800, were located on the Rock River which is considerably north of the lands in controversy. Auguste Chouteau places the establishment of the Rock River location as 1764, while first references to the Sac village on the Des Moines River occur around 1780. All of these village sites are confirmed in subsequent reports, and in 1810, Zebulon Pike sets them out specifically in a report on his 1805 Mississippi River expedition.
 
 
 27
 During the War of 1812 with Great Britain, those members of the Sac and Fox Nation, who claimed allegiance to the cause of the United States departed their Mississippi River villages, and began to move down into Cession 69. There, during the years that followed, they were located at various places, and times in the company of the Iowas. Reports have placed them on the Salt, Missouri, Osage, Grand and Chariton Rivers.
 
 
 28
 Having established their villages on the Mississippi around 1760, the Sac and Fox began to hunt the adjacent area on both sides of the river from as far north as Prairie du Chien to as far south as the mouth of the Illinois River. The principal hunting grounds of the Sac Indians west of the Mississippi River stretched southward below the Des Moines River to the Missouri River, and includes generally the northeastern part of Cession 69 and all of Cession 50. Cession 50 lies immediately east of Cession 69 and west of the Mississippi, and embraces all those lands which were ceded to the United States by the Sac and Fox Treaty of 1804. The evidence contains many references to the Sac and Fox hunting in this vicinity which show consistent use from about 1780 to at least 1810.
 
 
 29
 During the period from 1795 to 1824, the Sac and Fox hunted extensively the area in the eastern and southern parts of Cession 69 from the Mississippi on the east to the Grand and Chariton Rivers on the west and from headwaters of such last-mentioned rivers on the north to the Missouri River on the south, and even beyond this area on the west and south. They were friendly with the Iowa and frequently hunted in the same area with them. The early explorers, traders, and military people supplied much of this evidence and information. For instance, in his 1806 Report to the Congress, Captain Lewis said that the Sac and Fox Nation sometimes hunted toward the Missouri and Lieutenant Pike in 1810, based on his explorations made in 1805, stated that the Sacs hunted on the Mississippi River and its tributaries from the Illinois River north to the River Iowa "and on the plains west of them which border the Missouri."
 
 
 30
 Captain Lewis in 1808 described the Fire Prairie, which is located near the southwest corner of Cession 69 as convenient to "the principal hunting grounds of the Ioways and Saucs."
 
 
 31
 The Missouri Gazette informed its readers in 1813 that more than 1500 Sac and Fox Indians had gone to their "wintering grounds, * * * besides those contained in 155 canoes which ascended the Missouri on Monday last, near 500 warriors crossed over by land."
 
 
 32
 Two years later, General Clark reported that members of the Sac and Fox Nation resided west to northwest of St. Louis on both sides of the Missouri River. In 1819, Major Long who had recently explored the Missouri River, stated that the Sac and Fox and Iowa Nations hunted on the plains towards the sources of the Grand River. Indian Agent Sibley in 1820, reported that the Sac and Fox and Iowa Indians regularly made a fall hunt on the Missouri River. Sac and Fox Agent Forsyth mentions the presence of Sac and Fox along and near the Missouri River and in the vicinity of the Grand River in the years 1817 to 1820. In an extensive report concerning the Sac and Fox Nation which Agent Forsyth originally wrote in 1822, and later revised in 1827, he says that the members of the Sac and Fox Nation would hunt "on the waters of the Missouri River and its tributaries" and sometimes further west.
 
 
 33
 From about 1812 to 1825, the Sac and Fox Nation had a village on the north side of the Missouri River between the Chariton and Grand Rivers and therefore on the west boundary of the lands claimed in this appeal. An early settler reported that the Sac and Fox had a village in 1818 east of the Chariton River in present Randolph County, Missouri, near the present town of Yates. In 1819, there was a Sac camp on the Missouri River below Fort Osage and also near the mouth of the Grand River. For a time (1815-1818) there was also a Sac village south of the Missouri River near Jefferson City, Missouri.
 
 
 34
 During the period under consideration, it is estimated that the combined populations of the Sac and Fox tribes was between 4,400 and 6,500 persons.
 
 
 35
 It appears from all the facts that there was some basis for the claim of the Sac and Fox Nation that it had actual exclusive and continuous use and possession of the east and south portions of Cession 69 for a long time prior to the Treaty of 1824.
 
 
 36
 The United States made two separate but similar treaties with the Iowa and the Sac and Fox on August 4, 1824, 7 Stat. 229 and 7 Stat. 231, by the terms of which both tribes ceded to the United States all their right, title, interest, and claim to the lands in northern Missouri which are designated on Royce's maps of Indian land cessions as Area 69 (18th Annual Rep., B.A.E. 1896-1897, Part II). Both tribes later filed a joint petition in this case with the Indian Claims Commission under the Indian Claims Commission Act, supra, seeking additional compensation for the cession of their respective tracts of land within Area 69 for all of the reasons set forth above.
 
 III
 
 37
 We will consider first the issue raised by the Iowa and the Sac and Fox as to whether or not the Indian Claims Commission erred in making 1803 the cutoff date in establishing Indian title to the lands in question. Both tribes offered much evidence bearing on their acquisition of aboriginal title after 1803, and up to 1824, but the Commission refused to consider it, saying:
 
 
 38
 Before turning our attention to those claims founded upon aboriginal use and occupancy, this comment may be in order. By virtue of the Louisiana Purchase of April 30, 1803 (8 Stat. 200), the United States acquired from France, subject to the present Indian right of occupancy, a vast expanse of territory which includes the lands in controversy. The bulk of evidence introduced by the petitioners in support of their claim of title cites events occurring just prior to and subsequent to the 1803 date. As we view the evidence in this case, the 1803 date is critical to the issue of aboriginal title, since, in the absence of government recognition (which we have just rejected), these Indians were powerless to increase their aboriginal holdings after 1803. Therefore, each petitioner must satisfy the Commission that it owned in Indian fashion the claimed subject lands or any portion thereof as of 1803, and that it reasonably maintained such ownership until the treaties of cession in 1824.[7] [Emphasis supplied.]
 
 
 39
 It will be observed that the Commission itself states that the bulk of evidence offered by the tribes in support of Indian title cites events occurring just prior to and subsequent to 1803. The record supports this statement by the Commission. The sole question then, on this point, is, whether or not the Commission should have considered such evidence as proof of Indian title of the tribes to the land claimed by them in Cession 69. We think the Commission should have done so.
 
 
 40
 In refusing to consider the post 1803 evidence, the Commission appeared to have confused Indian title with sovereign or legal title, although there is a great difference between them. At any rate, the Commission took the position that once sovereign title attached to land, Indian title could not thereafter be established. We do not agree.
 
 
 41
 Chief Justice John Marshall thoroughly discussed sovereign title and Indian title in the early case of Johnson & Graham's Lessee v. McIntosh, 21 U.S. (8 Wheat.) 543, 570-603 (1823). He pointed out that when the various parts of the new world were discovered by explorers of the nations of Europe, a principle of international law was developed and recognized by all the nations to the effect that discovery of new land carried with it the right of sovereignty or sovereign title to the discovered land which vested immediately in the sovereign of the nation whose explorer discovered it, subject to the right of use and occupancy by Indians living on it. Of course, the boundaries of discoveries were many times vague and indefinite, and this led to disputes and even wars between the nations over the sovereign or legal title or ownership to a given area of land. But the basic principle of sovereign title was recognized by all. It gave the sovereign the absolute right to sell, give or grant the legal title to another person or to another nation. No one questioned this right once sovereignty was established over land. It was inevitable such a system would develop in the scheme of things as it existed at the time of the new world discoveries. Obviously sovereign or legal title to land could not be in two different nations or persons at the same time, as no sale of it could ever be made under such circumstances.
 
 
 42
 However, the right of sovereignty over discovered land was always subject to the right of use and occupancy and enjoyment of the land by Indians living on the land. This right of use and occupancy by Indians came to be known as "Indian title." It is sometimes called "original title" or "aboriginal title." It is not the same as sovereign or legal title. Land owned by Indian title is owned by the tribe and not by an individual Indian. It must be used within the tribe and subject to its laws and customs and cannot be sold to another sovereign government nor to a citizen of any sovereign government. Johnson & Graham's Lessee v. McIntosh, supra.
 
 
 43
 This system of right of discovery and its inclusion of sovereign title subject to Indian title held by Indians living on the land was accepted by the United States and became a part of its laws. Johnson & Graham's Lessee v. McIntosh, supra; Worcester v. State of Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). It has been observed and applied through the years by the Government in its acquisition and sale of land where Indian title existed. In cases involving these situations, the courts have held that sovereign or legal title to land, as distinguished from Indian or aboriginal title, may be obtained (aside from discovery or the purchase from the sovereign of a discoverer) by treaty, statute or an agreement. Otoe and Missouria Tribe of Indians v. United States, 131 F.Supp. 265, 275, 131 Ct.Cl. 593, 608 (1955), cert. denied, 350 U.S. 848, 76 S.Ct. 82, 100 L. Ed. 755.
 
 
 44
 Indian title has likewise been defined many times by the courts. For instance this court defined it in the case of Sac and Fox Tribe of Indians of Oklahoma v. United States, 315 F.2d 896, 903, 161 Ct.Cl. 189, 201-202, (1963), cert. denied 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 as follows:
 
 
 45
 * * * To be accepted under the Indian Claims Commission Act, aboriginal title must rest on actual, exclusive, and continuous use and occupancy "for a long time" prior to the loss of the property. (Cases omitted.)
 
 
 46
 See also Confederated Tribes of the Warm Springs Reservation of Oregon v. United States, App. No. 2-64, decided October 14, 1966, slip op. p. 6, and cases collected therein.
 
 
 47
 The courts have also construed the terms "use and occupancy" requirement of Indian title to mean use and occupancy in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers. In the case of Mitchel v. United States, 34 U.S. (9 Pet.) 711, 745, 9 L.Ed. 283 (1835), the Supreme Court said:
 
 
 48
 Indian possession or occupation was considered with reference to their habits and modes of life; their hunting-grounds were as much in their actual possession as the cleared fields of the whites; * * *.
 
 
 49
 See also Confederated Tribes of the Warm Springs Reservation of Oregon v. United States, supra.
 
 
 50
 It is a matter of common knowledge that in the course of years, and especially during the early years of the United States, the use and occupancy of land by Indian tribes changed continuously. New tribes would appear and old ones would disappear or move on to new territories. Sometimes land of one tribe would be exchanged for that of another, or one tribe would acquire the land of another as the result of an Indian war or by right of conquest.
 
 
 51
 In the case before us, the Indian Claims Commission approved and recognized the right of discovery doctrine with its attribute of sovereign title to land by holding that the United States acquired sovereign title to the lands in question in 1803, by virtue of the Louisiana Purchase from France. In other words, it held that France had sovereign title by right of discovery, subject to the right of use and occupancy by Indians living on it, and we purchased that title in 1803. Inferentially, if there had been any change in Indian title among the Indians using and occupying the land between the time of the French discovery and the French sale to our Government in 1803, such change would have been recognized. But the Commission froze all changes in Indian title as of 1803, and refused to consider any changes between that date and 1824, the date of the Treaty of Cession. If the Commission had been consistent, it would have frozen the date of changes of Indian title as of the date of discovery of the land by the French instead of 1803. The Louisiana Purchase only gave us such title as the French had and there was no addition to the validity of the sovereign title to the land by our purchase of it in 1803 — there was no magic to that date.
 
 
 52
 It would not be in accordance with facts nor history to freeze all Indian titles as of the date of the discovery of America, nor with our own Declaration of Independence in 1776. We know that there was considerable change in such titles after these dates. Consequently, it is not possible to fix any cutoff date for the establishment of Indian title, except the date the Indians lose the land through treaty or otherwise. In this case, that date is 1824, the date of the cession of the land to the United States by treaty.
 
 
 53
 By refusing to consider evidence of Indian title acquired after 1803, the Commission took the position, in effect, that since the United States acquired sovereign or legal title from France in 1803, no one — not even the Indians — could acquire any kind of title — not even Indian title — after that date except by grant from the Government itself. Such a position would be correct as to sovereign or legal title, but not as to Indian title.
 
 
 54
 We think the Commission committed error in refusing to consider the evidence of the tribes as to Indian title acquired by them between 1803 and 1824. Use and occupancy of a portion or of all of the land in question by them between these dates, especially when connected with use and occupancy immediately prior to 1803, could well have been use and occupancy "for a long time" and sufficient to constitute Indian title to the land.
 
 
 55
 Accordingly, we remand this case to the Commission for its consideration of Indian title evidence between 1803 and 1824, so that it may determine from such evidence whether or not the land awarded to the Iowa or the Sac and Fox, or either of them, should be increased or changed in any way, and, if changed, to determine the change, if any, of the award to be made to them and to each of them, all in accordance with this opinion.
 
 IV
 
 56
 We hold that there is substantial evidence to support the decision of the Commission that the fair market value of the Iowa land as of January 18, 1825, was $0.45 per acre and the fair market value of the Sac and Fox tract as of that date was $0.80 per acre. However, upon remand of this case, should the Commission determine that the amount of land due either or both tribes should be changed or enlarged, the Commission will at the same time determine whether or not the per acre valuation of either or both tracts should be changed, and if so, the amount of such change.
 
 V
 
 57
 We agree with the Commission that the United States did not recognize the title of the Sac and Fox to any of the land claimed in this case by the Treaty of November 3, 1804.
 
 VI
 
 58
 The alternative theory of recovery advanced by the tribal claimants is founded upon a purported "constructive trust" that existed between the United States and the appellants' ancestors with respect to the defendant's acquisition of the two subject tracts. This theory is not concerned with fixing a fair market value to the lands involved, but the amount of any recovery is to be measured by the value of the consideration that the defendant received in disposing of these lands through public sale or otherwise.
 
 
 59
 The main thrust of appellants' argument is that by virtue of certain legislative enactments such as the Trade and Intercourse Act of 1802, 2 Stat. 139,[8] a certain fiduciary relationship was placed on the United States with respect to appellants and that the defendant's payment of an unconscionable consideration for the lands involved worked a fraud upon the Indian tribes resulting in the imposition of a "constructive trust."
 
 
 60
 In summary then, appellants contend that the defendant finds itself in the position of a constructive trustee because of its guardian-ward, or other fiduciary relationship to the tribal claimants; that the defendant breached its fiduciary duties when it acquired the subject tracts for an unconscionable consideration; and that this necessitates a recovery in a sum equal to the consideration received by the defendant from its disposition of their lands.
 
 
 61
 Appellants' reliance on the Trade and Intercourse Act of 1802, is prompted by our recent decision in Seneca Nation v. United States, 173 Ct.Cl. 917 (1965), which construed a prior version of this same Act. In that case, the Senecas sought to charge the United States for four sales of their lands by them, at allegedly inadequate prices, to private parties. As to three of the sales (those which occurred after the passage of the Act) we concluded that the Indian Claims Commission erred in failing to hold that, through the Trade and Intercourse Act, the United States had a special, a fiduciary, responsibility over sales to third parties to see that a proper and conscionable consideration was paid. We said that wherever the Act applied the United States would be liable under either clause (3) or clause (5) of section 2 of the Indian Claims Commission Act,[9] supra, as a fiduciary for an unconscionably low consideration received by the Indians.
 
 
 62
 The question, if there was one, of the measure of damages was not reached since the case was remanded to the Commission for a determination of whether consideration paid by the vendees was unconscionable.
 
 
 63
 From that case the appellants stride to the proposition that if the defendant can be held liable as a fiduciary to an Indian tribe for an unconscionable sale of tribal lands to a third party by the Indians, obviously the defendant should be fully accountable as a fiduciary to the Indians where it was a party to the unconscionable transaction.
 
 
 64
 Although we agree that the appellants should be compensated for their land, it does not follow in the circumstances of this case that the remedy for payment by the defendant of an unconscionable consideration is the imposition of a "constructive trust" compelling the defendant to disgorge whatever profit it made from subsequent sales to homesteaders.
 
 
 65
 As previously mentioned, we were not faced with that issue in Seneca Nation, supra, but it should be noted that section 12 of the Trade and Intercourse Act of 1802, related to transactions between Indian tribes and third parties and requires the consent of the Federal Government to any disposition of Indian lands to third parties. That Act adds little to judicial expressions that the Government, in its dealings with the property of Indians, is a trustee. Cf. Oneida Tribe v. United States, 165 Ct.Cl. 487, 493 (1964), cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544.[10] But the label attached to the relationship by the courts, whether it be trustee, fiduciary, or guardian is unimportant alone and does not control the measure of accountability. We must look to the language contained in the treaty, agreement, order, or statute under which the claim is brought to ascertain whether there exists, (1) a legal relationship wherein the United States is in fact and in law a trustee, fiduciary or guardian, or (2) a general relationship without any of such attributes or obligations, but which is described in the same terms by the courts. United States v. Seminole Nation, 173 F.Supp. 784, 790, 146 Ct.Cl. 171, 181 (1959); Gila River Pima-Maricopa Indian Community v. United States, 140 F.Supp. 776, 780-781 135 Ct.Cl. 180, 189, (1956). Compare Ottawa Tribe v. United States, 166 Ct.Cl. 373 (1964), cert. denied, 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341; Navajo Tribe of Indians v. United States, 364 F.2d 320, 322, 176 Ct.Cl. 502, 504 (1966); see Oneida Tribe, supra. When this is done in this case, we are required to hold that the relationship between the parties was a general one in which there was no legal guardianship or resultant constructive trust.
 
 
 66
 Appellants can point to no language in the Trade and Intercourse Act, their treaties, or other legislation which would justify imposition upon the defendant of a liability greater than that which is ordinarily exacted in comparable situations, namely, the fair market value of the lands at the date of acquisition by the defendant. United States v. Emigrant New York Indians, App. No. 2-65, decided October 14, 1966, slip op. p. 19; Sac and Fox Tribe of Indians of Oklahoma v. United States, supra, 315 F.2d at 897, 161 Ct.Cl. at 199; Miami Tribe of Oklahoma v. United States, 175 F.Supp. 926, 954 146 Ct.Cl. 421, 470, (1959); United States v. Kiowa, Commanche and Apache Tribes, 163 F.Supp. 603, 608, 143 Ct.Cl. 534, 541-42, (1958); Nooksack Tribe v. United States, 162 Ct.Cl. 712, 718 (1963), cert. denied, 375 U.S. 993, 84 S. Ct. 633, 11 L.Ed.2d 479 see Otoe and Missouria Tribe of Indians v. United States, supra, 131 F.Supp. at 290, 131 Ct.Cl. at 632-633.
 
 
 67
 In cases much stronger than the present where this court held that prices paid to the Indians for surplus unallotted reservation lands were unconscionable and that duress was exerted upon them by the defendant to complete the transaction, there was no suggestion that recovery of the net proceeds received by the defendant from white settlers would be proper. In fact, the court valued these surplus lands as of the date of ratification of an agreement with the Indians for the purchase of their lands for white settlement. Sac and Fox Tribe of Indians of Oklahoma v. United States, 340 F.2d 368, 167 Ct.Cl. 710 (1964).
 
 
 68
 We are not persuaded by the appellants' attempt to circumvent this rule by channeling their claim through clause (2) of section 2 of the Indian Claims Commission Act.[11] The defendant properly points out and the appellants do not contest that the rule they argue for would entirely eliminate the requirement that lands must be valued as of the date of acquisition.
 
 
 69
 Moreover, it has been recognized that not only is the measure of recovery the date of acquisition by the defendant under clause (3), but it is also the date of acquisition under clause (4), Nooksack Tribe v. United States, supra; Sac and Fox Tribe of Indians of Oklahoma v. United States, supra, 315 F.2d at 897, 161 Ct.Cl. at 199, and under clause (5). United States v. Emigrant New York Indians, supra; United States v. Kiowa, Commanche and Apache Tribes, supra.
 
 
 70
 Appellants' contention that claims involving payment of an unconscionable consideration asserted under clause (2) of section 2 of the Indian Claims Commission Act, are not the same as claims based solely upon unconscionable consideration under clause (3), lacks merit. We are of the opinion that a different rule of damages cannot be applied to a claim predicated upon payment of an unconscionable consideration, which is cognizable under different clauses of section 2, merely by the caption affixed to the pleadings.
 
 
 71
 We are satisfied that our prior standard of recovery under the Act does not at all restrict the legislative objectives, indeed, the briefs of the appellants in the instant matter make no such argument. We are content, therefore, to rest upon the principles of stare decisis and legislative acquiescence in the judicial interpretation of statutes. See United States v. South Buffalo Ry. Co., 333 U.S. 771, 774-775, 68 S.Ct. 868, 92 L.Ed. 1077 (1948); Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 14, 59 S.Ct. 675, 83 L.Ed. 1071 (1939); United States v. Elgin, J. & E. Ry. Co., 298 U.S. 492, 500, 56 S.Ct. 841, 80 L.Ed. 1300 (1936). To the extent that these principles afford a measure of stability and predictability in our legal system, they are of great value. Accordingly, the measure of recovery to be accorded the appellants in the circumstances of this case is the fair market value of their Indian title lands at the date of acquisition by the defendant, less allowable offsets and payments already made as determined by the Commission.
 
 
 72
 The decision of the Indian Claims Commission is affirmed in part and reversed in part, as indicated in this opinion, and the case is remanded to the Commission for further proceedings consistent with this opinion.
 
 
 73
 Affirmed in part, reversed in part, and remanded.
 
 APPENDIX
 
 74
 NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 Notes:
 
 
 [1]
 6 Ind.Cl.Comm. 464 (1958); 12 Ind. Cl.Comm. 487 (1963); 15 Ind.Cl.Comm. 248 (1965)
 
 
 [2]
 18th Annual Rep., B.A.E., 1896-1897, Part II
 
 
 [3]
 7 Stat. 231
 
 
 [4]
 Indian Claims Commission Act, 60 Stat. 1049, 1050, 25 U.S.C. § 70a (1964)
 
 
 [5]
 7 Stat. 84
 
 
 [6]
 A map is appended to this opinion for the sake of clarity
 
 
 [7]
 6 Ind.Cl.Comm. 464, 501-02 (1958)
 
 
 [8]
 Section 12 of the Act of March 30, 1802, 2 Stat. 139, 143, entitled "An Act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers" is as follows:
 "Sec. 12. And be it further enacted, That no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian, or nation, or tribe of Indians, within the bounds of the United States, shall be of any validity, in law or equity, unless the same be made by treaty or convention, entered into pursuant to the constitution: and it shall be a misdemeanor in any person, not employed under the authority of the United States, to negotiate such treaty or convention, directly or indirectly, to treat with any such Indian nation, or tribe of Indians, for the title or purchase of any lands by them held or claimed, punishable by fine not exceeding one thousand dollars, and imprisonment not exceeding twelve months: Provided nevertheless, that it shall be lawful for the agent or agents of any state, who may be present at any treaty held with Indians under the authority of the United States, in the presence, and with the approbation of the commissioner or commissioners of the United States, appointed to hold the same, to propose to, and adjust with the Indians, the compensation to be made, for their claims to lands within such state, which shall be extinguished by the treaty."
 Appellants also rely upon the following passage of the Northwest Ordinance originally adopted in 1787, and reenacted and confirmed on August 7, 1789, 1 Stat. 50, 52:
 "ART. III. * * * The utmost good faith shall always be observed towards the Indians; their land and property shall never be taken from them without their consent; and in their property, rights and liberty, they never shall be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall from time to time be made, for preventing wrongs being done to them, and for preserving peace and friendship with them."
 Appellants place emphasis on the following articles of their respective treaties:
 "Treaty of August 4, 1824, 7 Stat. 231 (Iowa Tribe);
 "ARTICLE 4th. The undersigned Chiefs, for themselves, and all parts of the Ioway tribe, do acknowledge themselves and the said Ioway Tribe, to be under the protection of the United States of America, and of no other sovereign whatsoever; and they also stipulate, that the said Ioway tribe will not hold any treaty with any foreign powers, individual state, or with individuals of any state.
 "Treaty of November 3, 1804, 7 Stat. 84, 85 (Sac and Fox);
 "ARTICLE 1. The United States receive the united Sac and Fox tribes into their friendship and protection, and the said tribes agree to consider themselves under the protection of the United States, and of no other power whatsoever.
 * * * * *
 "ART. 4. The United States will never interrupt the said tribes in the possession of the lands which they rightfully claim, but will on the contrary protect them in the quiet enjoyment of the same against their own citizens and against all other white persons who may intrude upon them. And the said tribes do hereby engage that they will never sell their lands or any part thereof to any sovereign power, but the United States, nor to the citizens or subjects of any other sovereign power, nor to the citizens of the United States."
 
 
 [9]
 Clauses (3) and (5) of section 2 provide: "The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, * * *: (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, * * *; (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity
 
 
 [10]
 This statement is equally applicable to the provisions of the treaties and other acts the appellants rest upon for support
 
 
 [11]
 Clause (2) of section 2 provides: "The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, * * *: (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; * * *