UNITED STATES v. HIGGINS, County Treasurer.

(Circuit Court, D. Montana. July 2, 1900.)

No. 576.

TAXATION—LIABILITY OF HALF-BREEDS TO STATE LAWS.

One born of a white father and an Indian mother, and who is a recognized member of the tribe of Indians to which his mother belongs, is an Indian, and not subject to taxation under the laws of the state in which he resides.

W. B. Rodgers, U. S. Dist. Atty.
Marshall, Stiff & Denny, for defendant.

KNOWLES, District Judge. This is a suit brought by the United States against George Higgins, the treasurer and tax collector of Missoula county, to enjoin him from collecting a tax from one Alexander Matt. It appears from the evidence in the case: That said Matt is the owner of a number of horses and cattle ranging upon the Flathead Indian reservation, sometimes called "Jocko Indian Reservation," in the state of Montana. That in the year 1897 one W. R. Hamilton, the then assessor of Missoula county, listed said property as that of the said Matt for taxation, and that the amount of the taxes assessed upon the same for state and county purposes was the sum of $10.50. The said assessment was duly returned upon the proper assessment roll for said year to the then tax collector of Missoula county. The said Matt refused to pay this tax, and after the same became delinquent said George Higgins, as treasurer and tax collector of said county, seized two head of cattle, the property of said Matt, and advertised the same for sale at public auction, with a view to securing money sufficient to pay said tax, penalty, and the cost of collection thereof. The government brought this suit for the purpose of enjoining this sale, alleging that said Matt is an Indian and its ward. No contention has been made that the United States cannot maintain

this suit, if such is the fact. The defendant contends that said Matt should be classed as a white man, and not as an Indian, and that, as that part of the Flathead reservation where Matt resides lies within the exterior boundaries of Missoula county, he should list his property and be taxed in that county. The question here presented is, should Alexander Matt be classed as an Indian or a white man? If an Indian, he is not subject to taxation in said county.

From the evidence it appears: That the father of Matt is a Canadian Frenchman. That his mother was a Piegan Indian, and that Alexander Matt was born somewhere in the northeastern part of what is now known as "Montana" in the year 1853, at which time it was all known and classed as Indian country. His father moved to Colville, then in the territory of Washington, and seems to have lived there several years, and then returned to Montana some time in 1864, and lived at various places within the limits of what is now the state of Montana, coming to Stevensville, in the county of Missoula, in 1866 or 1867. At that time the Flathead Indians were the principal inhabitants of the Bitter Root valley. Shortly after the arrival of the father and mother of Matt in the Bitter Root valley, his mother was adopted into the Flathead tribe. She made application to be so admitted or adopted to Victor, the head chief thereof, who called a council of the leading men of his tribe; and by them, and with the consent of the chiefs of the tribe, it was declared that she was a member thereof. From that time on she and her children were recognized as members of the Flathead tribe. The father of Matt was a blacksmith, and generally followed that trade, and instructed his son therein. Subsequently the whole family moved to the Flathead Indian reservation, sometimes called "Jocko Indian Reservation," and said Matt has lived there since that time,—some 26 years. By article 2 of the treaty between the United States and the Flathead, Kootenai, and Upper Pend D'Oreille Indians, concluded July 16, 1855 (12 Stat. 976), it was provided that other friendly tribes and bands of Indians in the territory of Washington might be consolidated under the common designation of the Flathead nation, with Victor as head chief, upon the said Flathead Indian Reservation. The evidence shows that the said Matt had and has been recognized as a member of the Flathead tribe of Indians ever since his residence therein. It is claimed that notwithstanding these facts, the father of Matt being a white man, Matt would follow the condition of his father, and must be treated as a white man. It is undoubtedly true that a white man, although adopted into an Indian tribe, and treated by them in all respects as and like an Indian, cannot escape his responsibilities as a white man, and must be subject to the laws and the taxing power of a government of white men, embracing the section of country where he lives. But is it true that under our laws a child will always be classed as of the same color and race as his or her father? It is well known and settled that, if a mother is a slave, her children follow her condition. A government under which persons of the half-blood may reside can determine the status of such half-bloods,—as to whether they shall be classed as white people or as Indians. In the case of U. S. v. Holliday, 3 Wall. 419, 18 L. Ed. 182, the court held that in

the treatment of the Indians it is the rule of this court to follow the action of the executive and other political departments of the government. In the Case of The Kansas Indians, 5 Wall. 756, 18 L. Ed. 673, the court said:

"But the acts of the political department of the government settles beyond controversy that the Shawnees are as yet a distinct people, with a perfect tribal organization. As long as the United States recognize their national character, they are under the protection of treaties and the laws of congress, and their property is withdrawn from the operation of state laws."

In the case of U. S. v. Boyd (C. C.) 68 Fed. 580, it was said:

"In determining the attitude of the government towards the Indians,—all Indians,—the courts follow the action of the executive and other political departments of the government, whose more especial duty it is to determine such affairs."

In determining as to what class half-breeds belong, we may refer, then, to the treatment and recognition the executive and political departments of the government have accorded them. On August 4, 1824, the government made a treaty with the Sac and Fox Indians (7 Stat. 229), in which it was provided that certain land therein described should be set apart as a reservation for the use of the half-breeds of the Sac and Fox confederated Indian tribes. It will be observed that these half-breeds were described as belonging to said tribes. On June 30, 1834 (4 Stat. 740), these half-breeds were given permission to sell these lands. These Indians were again described as half-breeds belonging to those tribes. On April 27, 1816 (6 Stat. 171), an act of congress was passed for the relief of Samuel Manac, and he is described therein as "a friendly Creek Indian of the half blood." On March 3, 1837 (Id. 692), congress passed an act for the relief of James Brown and John Brown, half-breeds of the Cherokee nation of Indians. On September 29, 1817 (7 Stat. 163), the United States made a treaty with the Wyandot and other Indian tribes, and therein provision was made for the children of one William McCollock, and these children are described as quarter-blood Wyandot Indians. At the same time, and in the same treaty, provision was made for the children of one Isaac Williams, who is described as a half-blood Wyandot Indian. At the same time, and in the same treaty, provision was made for one Anthony Shane, who is described as a half-blood Ottawa Indian. On October 6, 1818 (Id. 191), in a treaty with the Miami Indians, there was a reservation of lands made in favor of Ann Turner, Rebecca Hackley, William Wayne Wells, Mary Wells, and Jane Turner Wells; each of them being described as a half-blooded Miami Indian. On November 15, 1824 (Id. 233), in a treaty with the Quapaw Indians, a reservation of land is made in favor of one Saracen, who is described as a half-breed Quapaw Indian. On June 2, 1825 (Id. 240), the United States made a treaty with the Osage Indians, and therein is made a provision for half-breeds. The language and scope of the treaty show that these half-breeds were persons of that tribe. On June 3, 1825 (Id. 245), in a treaty with the Kansas Indians, a reservation of land is made for a large number of persons, named and described as half-breeds of the Kansas nation. On August 5, 1826 (Id. 291), in a treaty with the Chippewas a reservation of land is made for

the benefit of a large number of persons named therein, described as half-breeds and Chippewas by descent. On October 16, 1826 (Id. 298, 299), in a treaty with the Pottawatomie Indians, a reservation of land is made for certain persons therein, described as half-breeds and Indians by descent. On October 23, 1826 (Id. 302), in a treaty with the Miami Indians a reservation of land is made for certain persons therein, described as the children of a half-blood Miami Indian woman. Similar descriptions of half-breeds as being Indians of the tribe with whom they lived will be found in the following Indian treaties: August 1, 1829 (7 Stat. 324), treaty with Winnebago Indians; July 15, 1830 (7 Stat. 330), treaty with Sioux Indians; August 30, 1831 (7 Stat. 362), treaty with Ottawa Indians; September 15, 1832 (7 Stat. 372), treaty with Winnebago Indians; September 21, 1832 (7 Stat. 374), treaty with Sac and Fox Indians; October 27, 1832 (7 Stat. 400), treaty with Pottawatomie Indians; March 28, 1836 (7 Stat. 493), treaty with Ottawa, etc., Indians; July 29, 1837 (7 Stat. 537), treaty with Chippewa Indians; September 29, 1837 (7 Stat. 539), treaty with Sioux Indians; November 1, 1837 (7 Stat. 545), treaty with Winnebago Indians; October 4, 1842 (7 Stat. 592), treaty with Chippewa Indians; October 18, 1848 (9 Stat. 952), treaty with Menominee Indians; March 16, 1854 (10 Stat. 1045), treaty with Omaha Indians; February 22, 1855 (10 Stat. 1169), treaty with Chippewa Indians; February 27, 1855 (10 Stat. 1174), treaty with Winnebago Indians; September 29, 1865 (14 Stat. 689), treaty with Osage Indians; October 14, 1865 (14 Stat. 705), treaty with Cheyenne Indians; March 21, 1866 (14 Stat. 756), treaty with Seminole Indians. On September 24, 1857 (11 Stat. 731), in a treaty with the Pawnee Indians it is provided that the half-bloods of that tribe who remain with them shall have equal rights with the other members thereof; that those who do not reside with the tribe shall be entitled to scrip in lieu of lands. On March 12, 1858 (12 Stat. 999), in a treaty with the Ponca Indians it is provided that the half-breeds of that tribe residing with them shall have the same rights and privileges as the other members thereof, and that those residing among the whites in civilization shall be entitled to land scrip in lieu of lands.

In an act of congress approved June 5, 1872 (17 Stat. 226), the following provision is made in regard to the Flathead Indians:

"It shall be the duty of the president, as soon as practicable, to remove the Flathead Indians (whether of full or mixed blood) and all other Indians connected with said tribe and recognized as members thereof, from the Bitter Root valley in the territory of Montana to the general reservation, commonly known as the Jocko reservation, which by a treaty was set apart and reserved for the use and occupation of said confederated tribes."

The Jocko reservation, here referred to, is the Flathead reservation, named in the treaty with these Indians on the 16th day of July, 1855, above referred to. At the time this statute was passed the mother of Matt, according to the evidence, had been adopted into the Flathead tribe. Matt was undoubtedly a half-breed connected with that tribe, and was recognized as a member thereof. This statute recognized mixed bloods of the Flathead tribe as Indians. They are to be removed from the Bitter Root valley, which at the time was

being settled by whites. They were distinguished from the whites, as not being entitled to reside there. Considering the history of the Indian tribes throughout the United States, I am satisfied it will be found that the half-bloods of all tribes were the children of what was recognized as Indian marriages between white men and Indian women. But few instances can be found in which white women intermarried with Indian men. Considering, then, the treaties and statutes above referred to, I think it is evident that the executive and political departments of the government have recognized persons having at least one-half Indian blood in their veins, whose fathers were white men, which half-bloods lived and resided with the tribes to which their mothers belonged, as Indians. Considering the treaties and statutes in regard to half-breeds, I may say that they never have been treated as white people entitled to the rights of American citizenship. Special provision has been made for them,—special reservations of land, special appropriations of money. No such provision has been made for any other class. It is well known to those who have lived upon the frontier in America that, as a rule, half-breeds or mixed-blood Indians have resided with the tribes to which their mothers belonged; that they have, as a rule, never found a welcome home with their white relatives, but with their Indian kindred. It is but just, then, that they should be classed as Indians, and have all of the rights of the Indian. In 7 Op. Attys. Gen. 746, it is said, "Half-breed Indians are to be treated as Indians, in all respects, so long as they retain their tribal relations."

Entertaining these views, I hold that Alexander Matt should be treated as an Indian, and as such he is not subject to taxation under the laws of the state of Montana. The prayer of the bill will be granted. Let the injunction heretofore issued be made perpetual.