**TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS et al.**

**v.**

**The UNITED STATES.**

**Appeal No. 6–72.**

United States Court of Claims.

Jan. 23, 1974.

Glen A. Wilkinson, Washington, D. C., atty. of record for the Turtle Mountain Band of Chippewa Indians; Wilkinson, Cragun & Barker, Frances L. Horn, Washinton, D. C., and Stormon & Stormon, Rolla, N. D., of counsel.

Marvin J. Sonosky, Washington, D. C., for Red Lake and Pembina Bands, and others. Rodney J. Edwards, atty. of record.

Lawrence C. Mills, Chicago, Ill., atty. of record, for Little Shell Bands; Mills & Garrett and William R. Yowell, Chicago, Ill., of counsel.

Jonathan C. Eaton, Jr., Minot, N. D., atty. of record, for The Three Affiliated Tribes of the Fort Berthold Reservation.

Robert E. Fraley, U. S. Atty., Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for The United States.

Before DAVIS, SKELTON and KUNZIG, Judges.

## ON APPEALS FROM THE INDIAN CLAIMS COMMISSION

DAVIS, Judge:

These interlocutory appeals under the Indian Claims Commission Act concern Indian title to a large area in North Dakota, about 10 million acres along the Canadian border. In the early 19th century, numbers of Chippewas moved westward from their woodland home to the plains area in what is now Minnesota, North Dakota, and parts of Canada. They adapted to life on the plains and pushed back other tribes. Eventually, the flow of white settlement caught up with these plains Chippewas, who were known as Pembinas. In 1863, the Pembina Band of Chippewas ceded to the Federal Government the area (Royce 445) immediately to the east of the lands involved in this claim. By 1875, the Government had compelled a substantial part of the Pembinas, on threat of loss of their annuities from the 1863 cession, to move from the unceded portion (the lands now in dispute) to the White Earth reservation in Minnesota.

The remaining Pembinas stayed near the Turtle Mountains, and most of them formed the band known by that name.

After two unsuccessful attempts to negotiate a cession, Congress established the McCumber Commission to acquire this Pembina North Dakota region. This agency negotiated with the Chippewas until Little Shell, the hereditary chief, withdrew along with several others from the negotiations in protest.[1] The local Indian agent selected a "Committee of 32" to represent the Indians, and the negotiations continued, concluding with a pact on October 22, 1892.[2] After a long delay, Congress amended and approved the agreement on April 21, 1904, 33 Stat. 189, 193, and the Indians approved on February 15, 1905.

The present claim is for fair compensation for the area covered by the McCumber Agreement, which the Commission found to have been acquired in February 1905 (when the Indians confirmed the arrangement). Three Chippewa plaintiffs, the Turtle Mountain Band (Indian Claims Commission Docket 113), the Pembina Band (Docket 246), and the Little Shell Band (Dockets 191 and 221),[3] brought suit on this claim, asserting a cause of action under clauses 3, 4, and 5 of section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a (1946).[4] All three urge their case on behalf of the same general ancestral Indian group, although they dispute the name to be given it. The Commission determined that this ancestral group

1. The later history of this dissident group is uncertain. It appears that some, but not all, of the protesters may have returned to the Turtle Mountain Band and remained members. It is clear that some of this group received benefits under the treaty. See also Part V, *infra*.

2. A prior "Committee of 32" had been appointed to take a census of the Indians in this area, and it may have had identical or substantially similar membership.

3. Also known as the Chippewa Cree Tribe.

4. "The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians * * * (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity."

(which it called "Plains-Ojibwa") held Indian title to most of the area given over under the Agreement. 23 Ind.Cl. Comm. 315 (1970).

The Chippewa claim before the Commission conflicted to some degree with that of the Three Affiliated Tribes of the Fort Berthold Reservation (Docket 350).[5] The trial of the two demands was consolidated to the extent of the overlap. After hearing evidence, the Commission divided the overlap area between the Fort Berthold and Chippewa claimants, 25 Ind.Cl.Comm. 179 (1971), but partially modified this decision, in favor of the Chippewas, after rehearing. 26 Ind.Cl.Comm. 336 (1971).

The Turtle Mountain Band, the Pembina Band, and the Government are each dissatisfied with one or another aspect of the Commission's rulings. The Fort Berthold Tribes and the Little Shell Band are content to remain appellees. The appeals raise the following issues: (1) this court's jurisdiction to hear the case; (2) whether Chippewa Indians held aboriginal title to the awarded area at the date of taking; (3) whether the Commission properly allocated the overlap segment between the Chippewa and Fort Berthold claimants; (4) what designation should be given to the ancestral Chippewa landowning entity; and (5) the right of the Little Shell plaintiffs to separate representation. These questions will be taken up in order.

I

After filing an unqualified appeal, the Government has "reluctantly suggest[ed]" in its brief that the court lacks jurisdiction to hear the appeals under our Rule 171(a)(2).[6] The basis for this

contention is an order entered by the Commission with respect to the general Fort Berthold land claim. When it decided the over-all area owned by those Tribes—this was after it had initially divided the smaller overlap tract between the Chippewas and the Tribes— the Commission *sua sponte* decided the date the Government had acquired the Fort Berthold territory. On motion of those Indians, rehearing was directed on the date of that taking. The order noted that neither side (Government or Fort Bertholds) had submitted the issue for decision and that the plaintiff Indians had additional proof to offer on the subject. 26 Ind.Cl.Comm. 326 (1971). This reopening came before any of the present appeals was filed. Defendant argues, accordingly, that no part of the Commission's determination (including that pertaining to the Chippewas, who were not involved in the date of taking of the Fort Berthold lands) was ripe for review, at the time the appeals were filed, because the consolidated cases had already been reopened and there was therefore no settled appealable determination.

The simplest answer lies in the fact that the Commission ended the consolidation and severed the Fort Berthold case, "for the purpose of determining the acreage and fair market value" of their lands, at the time it originally fixed the Fort Berthold taking date— well before the appeals were noted. 25 Ind.Cl.Comm., 179, 214 (1971). This severance was not vacated, expressly or impliedly, by the later order reopening the date-of-taking facet of the Fort Berthold claim, and the Chippewa claimants, as well as the Government, were free to seek review of the Chippewa por-

---

5. The Three Affiliated Tribes of the Fort Berthold Reservation is a corporate entity recognized by the executive branch as the successor in interest to the following tribes: the Arikara, the Mandan, and the Hidatsa. These tribes were also known by other names, *e. g.*, the Hidatsa are often called the Gros Ventres.

6. "The running of the time for appeal is terminated by the filing of a timely motion with the Commission for rehearing or amendment of findings; and the full time for appeal fixed in paragraph (a)(1) of this rule commences to run and is to be computed from the entry of an order by the Commission finally disposing of such motion." Rule 171(a)(2).

tions of the previously consolidated, but now separated, cases.[7]

We reject the defendant's point that the reopening of the taking-date for the Fort Berthold region necessarily had the effect (whatever the Commission intended) of sewing all the cases together again. This argument rests on the possibility of double liability on the United States: it is conceivable that in two separate proceedings (this appeal, and the subsequent disposition of the Fort Berthold case),[8] both Chippewas and Fort Bertholds could establish Indian title to the land now in dispute between them. The Government also says that a modification by the Commission of its earlier finding as to the date of taking could lead to a change in the boundaries of the Fort Bertholds' lands, and that the final area might overlap with the Chippewa claim in some different but now undeterminable fashion.

██ This specter is not enough to cause us to solder together in this case what the Commission has sundered. It is of course not unusual, in proceedings under the Claims Commission Act, for issues to be tried separately. The system of interlocutory appeals authorized by the Act can result in seriatim disposition of various legal issues in a single claim.[9] If the parties so will and the Commission acquiesces, one issue, such as the extent of lands taken, can be tried and determined by a process entirely separate from that by which another question, such as the date of taking, is fixed. It follows that, if a party believes that an issue is logically dependent on another (so that one should be resolved first), or if it thinks that two issues are mutually interdependent (so that they should be tried or determined together), it is incumbent upon that side to raise this point before the Commission, or otherwise to give timely notice of its position. We have held that the Government, by failing to raise an issue in proper manner before the Commission, waives its rights to raise that point on appeal. United States v. Fort Sill Apache Tribe of Oklahoma, 480 F.2d 819, 202 Ct.Cl. —— (1973); Suquamish Tribe of Indians v. United States, 197 Ct.Cl. 775, 777 (1972).

Here, if the extent of the lands aboriginally held by the Fort Bertholds could vary with the date of taking, the need for joint resolution of those questions should have been raised seasonably below. The Government did not, however, tell the Commission, before it initially decided the Fort Berthold claim, that the extent of the taking might well depend upon the date of taking.[10] Similarly, the Government does not contest the relevant land claims of the Fort Berthold Indians on this appeal. The result is that, insofar as our acceptance of jurisdiction of the present appeals creates some risk of double liability for the Government, the predicament is wholly of the Government's own making —either its deliberate choice of strategy or its belated recognition of the interdependence of issues previously deemed separate.[11] This is not a situation in

---

7. The Fort Berthold taking date was tried by the Commission after the appeals were noted. The defendant objects to the Commission's going ahead with this trial while the instant appeals are pending, but this is not an issue presented by these appeals and we do not now consider it.

8. The Government has not, on its appeal here, raised the issue of Fort Berthold title to the overlap area, possibly seeking to preserve that question for a potential omnibus appeal at the final disposition of the Fort Berthold case.

9. For instance, the valuation process is often not reached until after the date and extent-of-taking issues have been decided by the Commission, appealed, and determined by this court.

10. The Commission, in granting rehearing on the date-of-taking issue, noted that " * * * neither the plaintiff nor the defendant had submitted this issue for decision * * * ". 26 Ind.Cl.Comm. 326 (1971).

11. It does not appear that, before the appeals were taken, the Government asked the Commission to reconsolidate the cases or made any suggestion tantamount to such a request.

which to abort appeals timely and properly taken after the Commission's severance of the Fort Berthold date-of-taking question. *Cf.* McGhee v. United States, 437 F.2d 995, 194 Ct.Cl. 86 (1971); Seminole Indians v. United States, 455 F.2d 539, 197 Ct.Cl. 350 (1972).[12]

## II

The Commission, as we have said, found that a Chippewa entity (which it denominated "Plains-Ojibwa") held Indian title prior to 1905 to the large region involved. The Government has appealed from this conclusion, asserting essentially four grounds: (1) Indian title was not acquired prior to the assumption of United States sovereignty through the Louisiana Purchase; (2) there was no exclusive use and occupation by Chippewas because of the presence of large numbers of "mixed-bloods"; (3) any Indian title that may have existed was "extinguished" prior to the 1905 taking; and (4) the findings on aboriginal title are inadequate.[13]

A. The Government urges that the assumption of sovereignty over this area by the United States in 1803, through the Louisiana Purchase, prevented the Chippewas from acquiring Indian title. The Commission, without dispute, placed the migration of the branch of the Chippewas which moved to this location at "[a]round the end of the eighteenth century," and hunting activity in the Turtle Mountain area was found to commence "around 1800." 23 Ind.Cl.Comm. 315, 328. The Government, interpreting two of our decisions[14] to mean that Indian title acquired after United States sovereignty must be somehow related to pre-sovereignty possession and use, insists that no Chippewa group could have Indian title to this area, because such use was admittedly not related to substantial and exclusive use and occupancy for an appreciable time before 1803.

■ This view misreads our earlier holdings. It is the essence of Sac and Fox Tribe v. United States, 383 F.2d 991, 179 Ct.Cl. 8 (1967), that sovereign and Indian title are separate but nonexclusive forms of ownership. Our opinion there demonstrates that both sovereign and Indian title can be held in the same lands at the same time. It follows that either sovereign or Indian title can be created, transferred, or destroyed independently of the other, and so we held in *Sac and Fox Tribe*, 383 F.2d at 999, 179 Ct.Cl. at 23. To require, as the Government would have us do, that Indian title assumed after the attachment of American sovereignty be related to a preceding Indian title by conquest, merger, or exchange, or to exclusive pre-sovereignty use and possession, would ignore the distinction between these two forms of ownership.[15]

We see no reason to limit or ignore the long series of cases, stretching back to Johnson & Graham's Lessee v. McIntosh, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), which have created and maintained this separation. To engraft upon the established doctrine the Government's suggested qualification would have the strange consequence that an Indian group which migrated and con-

---

12. We do not on this appeal pass on the issue, which is not before us, of whether the Commission can or should, in its discretion, reopen, in the severed Fort Berthold case, the extent of those Indians' acreage, as a result of or in conjunction with the Commission's redetermination of the taking date of the Fort Berthold lands.

13. Defendant also objects to the characterization of the land-holding group as "Plains-Ojibwa." This is treated in Part IV, *infra*.

14. Sac and Fox Tribe v. United States, 383 F.2d 991, 996–999, 179 Ct.Cl. 8, 19–23

(1967), and *id.*, 315 F.2d 896, 904–905, 161 Ct.Cl. 189, 205–206 (1963).

15. The Government makes much of a phrase in the later *Sac and Fox* opinion (" * * * especially when connected with use and occupancy immediately prior to 1803, * * *" 383 F.2d at 999, 179 Ct.Cl. at 23) as justifying its interpretation. The context of that phrase, however, clearly shows that it was intended to refer to the specific facts of that case, and not to suggest that the doctrine discussed was limited to such circumstances.

quered territory from another group of Indians shortly after 1803 could acquire aboriginal title, but if the same migrating group were to find no other Indians to oust, their own exclusive use and possession, no matter for how long a time, could not give them any ownership at all.

■■■ Defendant invokes the traditional doctrine that land interests cannot normally be acquired against the sovereign by adverse possession or lapse of time. But that very same principle was applied by the predecessor sovereigns, and if it were to be allowed to affect Indian title (in the way the Government seeks) no aboriginal title could have been obtained at any time after assumption of sovereignty on this continent by the first European powers. Of course, this has never been the rule for Indian ownership. *See* Sac and Fox Tribe v. United States, *supra*, 383 F.2d at 997, 998, 179 Ct.Cl. at 20–21, 22; Lipan Apache Tribe v. United States, 180 Ct.Cl. 487, 491, 492–493 (1967); United States v. Northern Paiute Nation, 393 F.2d 786, 792*ff.*, 183 Ct.Cl. 321, 333*ff.* (1968).

B. The Government has also raised the novel contention that persons of mixed white and Indian blood (who were numerous in North Dakota during the periods crucial to this claim) should not be considered Indians for the purpose of establishing the use and occupancy required for aboriginal title. It is clear that the Commission did consider mixed bloods to be Indians, and relied upon their use and occupancy (as well as that of the full bloods). 23 Ind.Cl.Comm. 315, 328–29.

There is no authoritative resolution of this question. The cases delving into the status of mixed blood almost always concern the ethnic identity of a specific individual, who has usually questioned either the jurisdiction of a court to try him for an offense, or the power of a state to tax him. A number of tests have been formulated for those objectives, some more useful for our purposes than others.

Probably the least helpful in determining Indian title is the biological standard, according to which the child receives at birth the ethnic identity of its father, and retains that character forever (unless the father abandons the family and the child is raised by its mother in the context of her culture). Smith v, Bonifer, 154 F. 883, 889 (C.C. D.Or.1907), aff'd, 166 F. 846 (C.A. 9, 1909); *cf.* United States v. Hadley, 99 F. 437 (C.C.D.Wash.1900); United States v. Higgins, 110 F. 609 (C.C.D. Mont.1901). The Government has directed us to no evidence with which to implement this test, nor has it even suggested that any such proof exists in manageable form. More fundamentally, this formula has little logical connection with the issue of whether mixed blood use and occupancy is to be counted the same as full blood possession. The particular ancestry of individual members of the mixed blood group obviously tell us very much less on this score than other factors such as the character of relationships between the full and mixed blood circles, the lifestyle and means of livelihood of the mixed bloods, their ethnic selfperception and the way they were viewed by the full Indians and the Government.[16]

On the other hand, two germane components combine to form a definition suggested by the foremost authority on federal Indian law, Felix S. Cohen:

Recognizing the possible diversity of definitions of "Indianhood," we may nevertheless find some practical value in a definition of "Indian" as a person meeting two qualifications: (a) That some of his ancestors lived in America before its discovery by the white race, and (b) that the individual is consid-

---

16. Some cases holding biological factors determinative have used the Indian custom of extending an Indian mother's ethnic identity to her children by a non-Indian father. F. Cohen, Handbook of Federal Indian Law 4 (1942). These cases suffer from the same defects as those holding the father's identity crucial.

ered an "Indian" by the community in which he lives. F. Cohen, Handbook of Federal Indian Law 2 (1942).

By hypothesis every person of mixed blood meets the first qualification. On the second, there is substantial evidence, as well as findings supported by such evidence, that the full-blooded Chippewas of the North Dakota plains considered the mixed blood group as Indians. Full and mixed bloods participated together in negotiations with the McCumber Commission. Undisputed evidence suggests that the full and mixed bloods often hunted together, and the Commission found that some mixed bloods recognized the chief of the full bloods as their leader. 23 Ind.Cl.Comm. 315, 328–330, 331. Thus, the common understanding at that time seems to have been that in that region the full and mixed bloods were members of the same over-all group, that they were all "Indians." At the very least, the Government has not shown that the Commission's findings on this issue lack the support of substantial evidence. The defendant makes much of the numerical superiority of the mixed bloods, but, as long as both groups are considered "Indians" for the establishment of aboriginal title, it makes no difference whether one or the other group was dominant in numbers.

Another test (set forth in United States v. Higgins, 103 F. 348, 349–350 (C.C.D.Mont.1900)), is that the courts should follow the policy of the executive in classifying mixed bloods as Indian or white. One difficulty with this course is that the departments have classified mixed bloods differently for different purposes, and have even adopted varying characterizations for the same objective at different times. *F. Cohen, supra,* at 2. But even if we were fully to accept this criterion, we could not overturn the determination below. There was sufficient evidence for the Commission to conclude that the mixed bloods were treated as Indians by competent agents of the executive branch. On this, the most significant historical fact is that mixed bloods participated, with the Government's approval and assistance, in the negotiations leading to the McCumber Agreement. A federal Indian Agent selected a committee of 16 full bloods and 16 half bloods to take a census of American Indian members of the group involved in the cession, and a committee of identical composition later negotiated with the McCumber Commission. Both the Government and the Chippewa appellants also refer to the series of negotiations with the Red Lake and Pembina bands which ultimately led to the cession, in 1863, of the area abutting the eastern boundary of the tract claimed in this proceeding. All that need be said on this matter is that the executive practice in those negotiations was at best inconsistent, and in any event the evidence of those discussions is less persuasive than the practice of the executive in arranging the cession of the specific lands in controversy here. It is noteworthy, moreover, that it was quite common for the Federal Government, in concluding treaties with Indians, to make provision for mixed bloods. *See* United States v. Higgins, 103 F. at 350–351; *see also* Sac and Fox Tribe v. United States, 159 Ct.Cl. 247 (1962). If any general policy of the executive departments emerges, it was to treat groups of mixed bloods living with or alongside of full blooded Indian groups as Indian.[17]

17. The Government also relies on certain observations of white explorers, traders or missionaries, and others who were not Government officials. Apparently, some of these commentators regarded mixed bloods as white, or at least as more "white" than "Indian." Although it is clear that all these observers were speaking in an anthropological or biological—rather than a legal—sense, it is not at all clear what distinctions they employed in differentiating between whites and Indians and what purposes they had in drawing the lines. The lack of articulated standards and the context of their remarks suggest that such evidence is not overly helpful in resolving the identity of mixed bloods for the precise purpose we now have before us.

Since we are concerned with identifying mixed bloods with Indians in the context of assessing claims to aboriginal title, it is likewise pertinent to consider whether the mixed bloods lived in the manner of their Indian relatives. The Commission found that the mixed bloods, as well as the full bloods, earned their livelihood substantially through hunting, and the two groups often hunted together. The Government does not dispute this, but merely stresses the dominance of the mixed bloods. In addition, the evidence indicates that the mixed bloods were apparently organized in the manner of an Indian band, and they were definitely independent of white social and political institutions.[18]

■ In sum, the Commission has found that, based on political, social and economic factors, these full and mixed bloods should be considered members of a larger Indian group, and we are unable to say that this conclusion lacks support in substantial evidence or that the Commission's view fails to satisfy appropriate legal tests distinguishing Indians from non-Indians. Even if the Government were successful in demonstrating that the mixed bloods formed separate political entities, the Commission's findings would still sustain the proposition that the two bands were in "joint and amicable" possession because of the extensive cooperation between them. Such contemporaneous joint possession by two or more Indian groups would be sufficient to establish aboriginal title. Iowa Tribe of Iowa Reservation in Kansas and Nebraska v. United States, 195 Ct.Cl. 365, 370 (1971); Confederated Tribes of Warm Springs Reservation v. United States, 177 Ct.Cl. 184, 194 n. 6 (1966); Sac and Fox Tribe v. United States, 315 F.2d 896, 903, n. 11, 161 Ct.Cl. 189, 202 n. 11 (1963).

Finally on this point, we reject the argument that mixed blood use and occupancy should be disregarded because a great many of them were British subjects residing for most of the year in Canada. The Government does not argue that all mixed bloods were Canadians, and its own evidence suggests the contrary. The demographic pattern in this area did not respect international boundaries, and full and mixed blood Chippewas could be found in large numbers on either side of the border. Considering all the evidence, we cannot say that the Commission lacked substantial support for holding (as we think it did) that American Chippewa full and mixed bloods, rather than Canadian mixed bloods, exercised sufficient dominion over the award area. That is a reasonable conclusion from the record as a whole, and we must accept the Commission's findings as adequate.

C. Another of the Government's challenges to the finding of Chippewa aboriginal title is that any such ownership in the area was "extinguished" before February 15, 1905, when the McCumber Agreement became effective. The Government says that extinguishment occurred because of the establishment of an Executive Order reservation, the impact of white settlement, or voluntary abandonment of the area by the Indians (or all three together).

In aid of this argument, defendant has presented what it characterizes as "new" evidence. These materials, which were not introduced before the Commission are summarized and set forth in an appendix to the Government's main brief, and we are asked to notice them judicially.[19] They include governmental reports and historical studies of the area; the vast majority are over half a century old.

---

18. Some evidence indicates that mixed bloods were excluded, at least in part, from participation in white institutions.

19. The Indian Claims Commission has authority, under our Rule 172(f), to supplement, modify or correct the record on appeal in the case of omission by error or accident, or misstatement. Government efforts to add the new material to the record under this Rule were rejected by the Commission.

Assuming *arguendo* that it would be proper to take judicial notice of these documents, the Government's effort to inject them at this stage comes too late. Judicial notice is merely a way of introducing evidence without resort to the ordinary formalities; it does not circumvent the requirements of orderly judicial procedure (Ohio Bell Telephone Co. v. Public Utilities Comm., 301 U.S. 292, 301–302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937); Shapleigh v. Mier, 299 U.S. 468, 475, 57 S.Ct. 261, 81 L.Ed. 355 (1937)), and one of those requirements is that appellate tribunals should ordinarily consider only what has been properly presented to the trier of fact below. Mutual Life Ins. Co. v. McGrew, 188 U. S. 291, 312, 23 S.Ct. 375, 47 L.Ed. 480 (1903); Arkansas v. Kansas and Texas Coal Co., 183 U.S. 185, 190, 22 S.Ct. 47, 46 L.Ed. 144 (1901). Since these documents were not presented in a timely fashion to the Commission, and no good excuse for this neglect has been suggested, it would be inappropriate for this court to include them in the record on appeal, or to consider them. *Cf.* Confederated Salish & Kootenai Tribes v. United States, 437 F.2d 458, 460, 193 Ct.Cl. 801, 805–806 (1971). This is not a situation like that in Otoe and Missouri Tribe of Indians v. United States, 131 F.Supp. 265, 285–286, 131 Ct.Cl. 593, 625–626 (1955), or Pawnee Tribe of Oklahoma v. United States, 109 F.Supp. 860, 869–870, 124 Ct.Cl. 324, 340–342 (1953), where the record before us was so sparse that it was necessary to remand to the Commission for consideration of other materials which were not proferred at the right time below. The Commission held long and thorough hearings in this case, and an enormous record was compiled during trial. We do not feel that it would be a correct exercise of our discretion to return this case for the consideration of some more items of evidence essentially cumulative in nature. In view of the age of the documents, and the lack of any suggestion of an excuse for not introducing them below a reopening of the case would be unwarranted. *See* Yankton Sioux Tribe v. United States, 175 Ct.Cl. 564, 577 (1966). We shall, instead, appraise the Government's points on the basis of the record made before the Commission.

1. Relying on United States v. Santa Fe Pacific R.R., 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), defendant says, first, that Indian title was extinguished before 1905 by the establishment of the Turtle Mountain reservation in Rollette County, North Dakota, by the Executive Orders of December 21, 1882 and March 29, 1884.

The prime lesson taught by *Santa Fe* is that the Constitution vests the power to deal with Indian tribes in Congress, and included in that power is the exclusive right to extinguish Indian title. 314 U.S. at 347, 62 S.Ct. 248. The sole and plenary power of Congress to deal with matters of Indian title has long been recognized. Lone Wolf v. Hitchcock, 187 U.S. 553, 564–565, 23 S. Ct. 216, 47 L.Ed. 299 (1903); Nadeau v. Union Pacific R.R., 253 U.S. 442, 446, 40 S.Ct. 570, 64 L.Ed. 1002 (1920); Quinault Allottee Assn. v. United States, 485 F.2d 139, 202 Ct.Cl. —— (1973); Three Affiliated Tribes of Fort Berthold Reservation v. United States, 390 F.2d 686, 691, 182 Ct.Cl. 543, 552–553 (1968). Congress may of course delegate this power, as when it sets up by statute " * * * machinery for extinguishment of claims, including those based on Indian right of occupancy." United States v. Santa Fe Pacific R.R., 314 U.S. at 350, 62 S.Ct. at 253. But the unilateral action of an officer of the executive branch cannot eliminate Indian title.

The legislative background of the McCumber Agreement raises the greatest doubt that, with respect to the area in suit, Congress at any time delegated this power, or that it intended to extinguish Indian title other than by agreement approved by the legislature. The general policy of the Federal Government to retain in Congress power over aboriginal lands was reflected in section

12 of the Indian Trade and Intercourse Act of June 30, 1834, 4 Stat. 729, 730, now codified at 25 U.S.C. § 177, which provided in part that:

> [N]o purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. * * *

See United States v. Santa Fe Pacific R.R., supra, 314 U.S. at 347–348, 62 S. Ct. 248. This same general policy of reserving to Congress the elimination of Indian ownership was extended to cover the area of North Dakota now in contention. In the act creating the Territory of Dakota, Congress provided:

> That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with any Indian tribe, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any State or Territory; but all such territory shall be excepted out of the boundaries and constitute no part of the Territory of Dakota, until said tribe shall signify their assent to the President of the United States to be included within the said Territory, or to affect the authority of the government of the United States to make any regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent for the government to make if this act had never passed

* * * " Act of March 2, 1861, 12 Stat. 239, sec. 1.

Congress, by this statute, indicated its purpose to continue its power over Indian affairs in the Dakota Territory. The same policy of preserving Congressional control over these Indian lands was carried forward with the appointment of the McCumber Commission, then by that body's negotiations, and finally by congressional ratification and adoption of the agreement between the Chippewas and the United States. It is against this strong background of the maintenance of Congressional control that the establishment of a reservation by executive action must be evaluated.[20]

■ Another principle of the Santa Fe opinion is that Indian settlement on a reservation should be seen as an abandonment of claims only when the specific circumstances warrant that conclusion. Santa Fe involved two reservations. The first, created by an act of Congress, was construed not to effect an extinguishment of Indian title. The rule of construction affirmed by the Court was that "extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." 314 U.S. at 354, 62 S.Ct. at 255. In this light, the Court considered the establishment of the first reservation as merely an offer by Congress to resolve Indian land claims, which offer was never accepted by conduct or otherwise. It was only the second reservation, established by Executive Order, that led to extinguishment of aboriginal title, and the Court was careful in phrasing its conclusion to indicate that the specific facts justified this result: "But in view of all of the circumstances, we conclude that its creation at the request of the Walapais and its acceptance by them amount-

---

20. It has been suggested that the General Allotment Act of 1887, 24 Stat. 388, was a retroactive and prospective Congressional validation of Executive Order reservations. F. Cohen, supra, at 299–300. But Congress may authorize Executive Order reservations for certain administrative purposes (such as to enable the executive branch more effectively to prevent white encroachment onto Indian land) without necessarily authorizing those reservations as a means of extinguishing Indian title.

ed to a relinquishment of any tribal claims to lands which they might have had outside that reservation and that that relinquishment was tantamount to an extinguishment by 'voluntary cession' * * * " 314 U.S. at 357–358, 62 S.Ct. at 257.

When we compare the situation in *Santa Fe* to that surrounding the establishment of the Executive Order reservation in Rollette County in 1882, a different picture emerges. The Commission did find that in 1876 the Chippewa Indians in this area petitioned Congress to establish a reservation for them. But we have been shown no evidence indicating that this Executive Order reservation fulfilled the Indians' request, or that the reservation so established was ever "accepted" by the Chippewas as a settlement of their land claims. There are, on the other hand, materials suggesting the opposite. Since these missing elements in the chain are at bottom matters of fact, the Commission's determination is binding upon us if adequately supported. Although the Commission clearly was aware of the Executive Order reservation, but nevertheless failed to find the elements necessary to conclude that title was extinguished prior to 1905, we assume either that the Commission's silence as to the reservation means it did not find the necessary factual elements (*cf.* Sac and Fox Tribe v. United States, 159 Ct.Cl. 247, 253–254 (1962), or that this theory was not adequately presented to the Commission,[21] in which event it need not be considered now. It is noteworthy that not only does the Government's argument run counter to the Commission's findings, but also that the Executive Order reservation theory conflicts with numerous statements of agents of the executive and legislative branches concerning these Chippewa claims.[22]

Taking both grounds together —that there is no adequate showing that (i) Congress authorized the extinguishment of the aboriginal title via an Executive Order reservation, and (ii) the Indians accepted the reservation as *quid pro quo* for giving up their claims—we must conclude that the Commission's aboriginal title determination is not vitiated by the establishment of the reservation.

2. In addition to its argument that the creation of an Executive Order reservation extinguished Indian title, the Government also contends that white settlement had the same effect. But if the Executive Order reservation was ineffective, in these circumstances, to end the aboriginal ownership, it follows *a fortiori* that the acts of private citizens were also insufficient. As we have stated, the power of Congress to eliminate aboriginal title is exclusive[23] and Congress specifically preserved Indian rights to this land, certainly as against white settlers, by the Act of March 2, 1861, 12 Stat. 239, *supra*. Unauthorized white encroachment would not affect the Chippewas' ownership.

3. The final phase in the Government's trilogy of extinguishment arguments is that the Chippewas "voluntarily abandoned" most of the area. It is true that by 1905 the buffalo had left

21. This possibility is suggested by vague language in the Government's main brief.

22. One significant indication that the reservation was not considered a solution to the Chippewa title problem is an exchange of correspondence between the Secretary of the Interior and the Assistant Attorney General in 1887. The Secretary asked if he could throw open unceded Chippewa land to white settlement, and was told that this would be illegal. Neither party ever mentioned the reservation, which had been established only a few years earlier. There are other post-

reservation statements by federal officials apparently acknowledging the rightfulness of the Chippewa claims, though this view was not unanimous.

23. As indicated in the *Santa Fe* case, *supra*, an exception must be made for the situation where an Indian request to the executive branch is followed by acceptance of a reservation as settlement of land claims. A unilateral attempt by Indians to alienate land to a private party would, however, be void. Act of June 30, 1834, sec. 12, 4 Stat. 729, 730, *supra*.

the eastern portion of the region; the Commission found that: "[i]n the 1800's the buffalo herds disappeared and white settlers increasingly moved into the Chippewa lands in North Dakota." 23 Ind.Cl.Comm. 315, 335. Nevertheless, we cannot substitute our judgment for that of the Commission on this issue, nor can we say on this record that the Commission's findings for the years preceding 1905 lack substantial support. As pointed out above, part of the evidence relied upon by the Government on this segment of its appeal was not before the Commission and thus is not a proper object of our consideration. In addition, the evidence recounted by the Commission in its findings for those years appears reliable. In its supplementary findings dated November 11, 1971 (26 Ind.Cl.Comm. 336, 356–59), the Commission dealt specifically with the period from 1863 to 1905 and alluded to evidence which substantiated its conclusions. These materials include Congressional reports, reports of Indian agents and other executive branch officials, Indian petitions and claims, which bolster the position that the Indians were still attempting to use the area in their fashion, and had not at all given up their ties or claims to the land.

■ D. The Government has also mentioned in this connection what it calls a "patent defect" in the conclusions below. The Commission, in its amended finding, stated:

> Considering all the evidence, we find that the Plains-Ojibwa exclusively used and occupied for a long time prior to 1905 an area bounded as follows: * * * .26 Ind.Comm. 336, 361 (1971).

It is said that this is not necessarily a finding that the Indians held aboriginal title at the time of taking in 1905. But the Commission made this ultimate finding in the context of ninety pages of subsidiary findings, decisions, and conclusions in these consolidated cases, and that enveloping background is much more significant than a grammatical or literal parsing of a single sentence. Where the findings as a whole support only one interpretation of an ultimate finding, that interpretation is the proper one. *Cf.* Sac and Fox Tribe v. United States, 159 Ct.Cl. 247, 253–254 (1962). From the findings as a whole the only reasonable conclusion is that the Commission determined that Indian title was held up to the time of taking.

There are likewise attacks on the subsidiary findings as too sparse and unrevealing, but we have not had difficulty in seeing what the Commission was driving at, nor have we been unable to perform our function of review (*cf.* Seminole Indians v. United States, 455 F.2d 539, 540–541, 197 Ct.Cl. 350, 353–354 (1972)). The findings are sufficient in the light of the record and of the contentions presented to the Commission. Unlike some other cases, there is no need here for a remand for further elucidation or additional specificity. And insofar as the Government may be contending that, even apart from its specific contentions discussed in this Part II, there is no substantial evidence to support the findings on Indian title, we must disagree. With those challenges eliminated, there is no doubt that the record upholds the findings and determination.

### III

The two Chippewa appellants, the Turtle Mountain and Pembina Bands, seek review of the Commission's allocation of land between the overlapping claims of Chippewa Indians and the Three Affiliated Tribes of the Fort Berthold Reservation. The Government has not entered this dispute (although it contests the Commission's findings on all Chippewa claims of aboriginal ownership as of the date of taking).[24]

The Commission first divided the overlap between the Chippewa and Fort Berthold Indians by its decision and order of March 30, 1971, 25 Ind.Cl.Comm.

---

24. *See* Part II, *supra.*

179, but later, on motion for reconsideration, altered the prior boundaries, shifting between 250,000 and 400,000 acres[25] from Fort Berthold to Chippewa ownership. 26 Ind.Cl.Comm. 336 (1971). Both decisions are accompanied by detailed findings of fact and references to evidence. The explanation for the change on reconsideration is that evidence submitted on the issue of recognized title[26] was later urged by the Chippewas as bearing upon the overlap in aboriginal ownership claims as well.

The Chippewa appellants, seeking the remainder of the overlap area, argue that the Commission's amended findings are not supported by substantial evidence. They attack the persuasiveness of the evidence credited by the Commission and set forth proof looking the other way, which they say carries greater weight. In particular, they press the contention that the same evidence relied upon by the Commission to establish post-1863 use and occupancy of the area found to be Chippewa (including the area added after reconsideration) also sustains Chippewa claims to that portion of the overlap awarded to the Fort Berthold Indians.[27] On the implied assumption that the Commission must either take this evidence as definitive for the whole area or else reject it entirely, appellants say that it was irrational for the Commission to have made the allocation it did.[28]

In our view, however, the evidence on which the Commission relied, taken as a whole, provides a substantial foundation for the conclusion reached. It starts with archaeological studies showing that the Fort Berthold tribes had inhabited this area for an extremely long time. Such evidence has previously been considered persuasive by this court. Pueblo de Zia v. United States, 165 Ct. Cl. 501, 506–507 (1964). The record also contains the observations of explorers, traders, missionaries and others, beginning with the first recorded white contact in 1738, and extending to the 1870–1883 period when the Indians were first confined on an Executive Order reservation and later dispersed to individual allotments. Added to these historical materials was the testimony of the Fort Berthold expert witnesses, which the Commission seems to have valued highly. This body of evidence supports Fort Berthold use and occupancy of the area ultimately awarded to them—directly, by indicating their presence in the area, and, inferentially, by showing that these Indians depended for their livelihood upon buffalo hunts ranging fifty miles from their permanent villages on the banks of the Missouri (these hunts would place them in the area ultimately awarded).

The evidence presented by the Chippewa appellants is likewise entitled to weight, and the Commission did rely on it, in part, in making other findings. But this does not mean that the Commission was compelled to build on this evidence for all issues, particularly when it conflicted with persuasive evidence of use and occupancy by the other Indian group in the overlap area.[29] In other

---

25. The lower estimate is offered by the Fort Berthold Indians, the higher by the Chippewa appellants.

26. The Commission rejected outright the Chippewa claim of recognized title; no party asks reversal of that ruling.

27. Much of this evidence consists of the reports of Indian agents. Appellant Pembina Band urges that our decision in Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347, 367 (1933), held that "[t]he most reliable" evidence is the reports of Indian agents. That statement, however, referred only to the evidentiary record in that specific case,

and did not imply that a finding contrary to the contents of an Indian agent's reports would lack substantial evidence for that reason alone.

28. Also included in this part of the appeal is a smaller strip of land that the Commission awarded to neither Indian group. Because the evidentiary basis of this claim is the same as that for the overlap area, we make the same disposition with respect to the unawarded area.

29. The Chippewa bands place great emphasis on the Treaty of Prairie du Chien, concluded between Chippewa and Sioux Indians in

words, both sides of this question are supported by creditable evidence, with neither side having an overwhelming preponderance of proof. This is, of course, the paradigmatic case for accepting the findings below—just as we would have accepted findings going the other way. *See, e. g.*, Sac and Fox Tribe v. United States, 315 F.2d 896, 903–904, 161 Ct.Cl. 189, 203 (1963). The findings to which the Commission comes are adequate both in form and substance.

### IV

The Commission found that Indian title to the awarded area was held at the time of taking by an entity it denominated the "Plains Ojibwa." The Indian Claims Commission Act, at 25 U.S.C. § 70a, empowers the Commission to hear claims " * * * on behalf of any Indian tribe, band, or other identifiable group of American Indians * * *." Three parties the Government, the Turtle Mountain band, and the Pembina Band, contend that "Plains-Ojibwa" fits *none of these categories*. Only the Little Shell Band supports the Commission's use of this term.[30]

The Commission found that the "Plains-Ojibwa" were an "identifiable group," describing them as that body of Chippewa Indians which migrated westward in the 19th century from woodlands to the plains of what is now Minnesota and North Dakota. *The findings* characterized the group in this way:

> 5. * * * The Plains-Ojibwa have also been known by many other names, among which are Bungi, Saulteaux, Turtle Mountain Band, Pembina Band, Little Shell Band, Chippewa and Chippewa-Cree.
> 6. The Plains-Ojibwa consisted of two distinct *ethnic* groups, the full bloods and the mixed bloods or half-breeds. * * * 23 Ind.Cl.Comm. 315, 328 (1970).

On motion for rehearing, the Commission retained "Plains-Ojibwa," because it thought that to cast its conclusion in the name of one band or the other would be a forbidden predetermination of the persons to benefit from an award. The Commission took the occasion to explain what it mant by "Plains-Ojibwa":

> The name by which the Chippewa landowning entity in these dockets has been known varied greatly during the 19th and early 20th centuries. Early in the 19th century this group was referred to as the People of the Red River, the Bungi, or the Saulteaux. By the middle of the 19th century this group was generally referred to and designated by the United States as the Pembina Band of Chippewas. Later in the 19th century and continuing to the date of cession the group was designated the Turtle Mountain Band of Chippewas. At various times this group was also known as the Little Shell Band of Chippewas. * * * In adopting that name the Commission did not intend it to be synonymous with the term used by anthropologists to refer to all plains Chippewa. Rather we intend "Plains-Ojibwa" to refer only to that group of Chippewa which was known in 1863 as the Pembina Band, and was later recognized by the United States as the Turtle Mountain Band. 26 Ind.Cl. Comm. 336, 348–49 (1971).

The Turtle Mountain and Pembina Bands both attack this designation of "Plains-Ojibwa," but reach different conclusions as to the identity of the landholding entity. The Turtle Mountains point out that "Chippewa" and "Ojibwa" are alternate forms of the same Indian word, and argue that "Plains-Ojibwa," even as limited by the Commission on rehearing, is too broad a designation since all Plains Chippewas did not live in the area involved. The

---

1825, which supports the boundaries claimed by the Chippewas. There is, however, no suggestion that the Fort Berthold Indians had any participation in the making of this private treaty, and so it cannot be deemed

by us to outweigh the evidence favoring them.

30. The Fort Berthold Tribes, being uninterested in this question, take no position.

Pembina Band, it is said, disintegrated or dissolved before the date of taking, and such of its members who remained in the awarded area became Turtle Mountain Band members. The result, in this submission, is that the proper owner of the claim is the Turtle Mountain Band.[31]

Appellant Pembina Band raises similar objections to "Plains-Ojibwa." The term was apparently coined by a Canadian anthropologist in 1914. In addition to being recent, it is challenged as unfamiliar and vague, since it is not mentioned in any of the 43 treaties or several statutes relating to the Chippewas. On the other hand, the Pembina Band argues that to specify the landowning entity as the Turtle Mountain Band would prematurely remove from consideration Pembina Band members who were moved to the White Earth Reservation in Minnesota in 1863, and also other eligible Chippewas who are not Turtle Mountain Band members. Thus, the Pembina Band suggests alternatively that any award should go to the "Pembina Chippewas" or to the "Pembina Band on behalf of all Pembina Chippewas."

The Government likewise objects to "Plains-Ojibwa," but merely makes this argument as part of its larger contention that no Indian group had aboriginal title to the area as of the date of taking. In its brief, the Government does not take sides in the Pembina-Turtle Mountain altercation over what name should be given to the landowning entity if an award is made.[32]

The task set for the Commission in the line of cases leading to and including our decision in Cherokee Freedmen v. United States, 195 Ct.Cl. 39 (1971), is not easy. As we have repeatedly said, the Indian Claims Commission Act provides relief for group but not for individual claims. See, e. g., Cherokee Freedmen v. United States, 161 Ct.Cl. 787 (1963). The Commission must determine which identifiable group of Indians was wronged. In so doing, it must allow all interested parties to participate. McGhee v. Creek Nation (United States), 122 Ct.Cl. 380 (1952). But when it comes to frame an award, it must not overstep its proper function by the way in which it denominates the wronged entity. Certain questions, such as "whether specific individuals, classes of persons, or subgroups saying that they are members or components of the prevailing group are entitled to participate in the judgment," Cherokee Freedmen v. United States, supra, 195 Ct.Cl. at 46, are for Congress or authorized administrative bodies, and not for resolution by the Commission or by this court. On this view of the functions of the Commission and the court, the problem has been thus described:

> We have always taken pains to assure that any group or person claiming a right to participate (at least colorably) in a judgment under the Act not be totally excluded, either by the form of the award or by the restrictive nature of the entity to which the award goes in name. Since Congress (or its agent) is to settle disputes as to the composition of, or membership in, the group entitled to the money, the Commission's judgment should not bar an individual or entity from urging before the other branches a right to share on the ground of such membership. 195 Ct.Cl. at 48.

Although the Commission must cast its awards in favor of a wronged entity—the "identifiable group"—it must avoid describing that body in such a way as to exclude any claimant with a colorable right, or to give a "leg up" to any one

---

31. Objections to the separate presence of the Little Shell Band are discussed at Part V, *infra*.

32. When pressed at oral argument for the answer to a hypothetical question, counsel for the Government opined that the Turtle Mountain Band was the group with which the McCumber Agreement was negotiated, and so it should be the named landowning entity, if any. But we have already rejected this as the dominant test for determining the "identifiable group" to whom the award should go. McGhee v. United States, 122 Ct.Cl. 380, 391 (1952).

of several, possibly competing, entities all deriving through the same ancestral group.

This is the framework within which we and the Commission must fix the identity of the Chippewa landowning entity in this case. We agree that the Commission was correct in not phrasing its conclusion as to the ancestral group in terms of one or the other specific band now before us. As the history of this area demonstrates, none of the present contending groups can properly claim to be the exclusive representative of the Chippewa Indian group which occupied the region during the nineteenth century and into the twentieth. The Pembina Band was at least partially dissolved by Government pressure in 1863, although some of its members remained in the area thereafter. As for the Turtle Mountain Band, the Commission found that a dissident group (the descendants of which claim to be Little Shell Band members) split off from the Turtle Mountains during the McCumber negotiations. There is also a serious question, pointed out in detail by the Pembina and Little Shell Bands, whether the current Turtle Mountain Band includes in its members other Pembina Chippewas who would appear, at least *prima facie*, to be entitled to participate in the award. *Cf.* Cherokee Freedman v. United States, 195 Ct.Cl. 39, 51–52 (1971). In this same connection, it is also important that each band can prescribe its own membership requirements, and we cannot discount the substantial possibility that there may be individual Indians whose ancestors were members of the original landowning entity but who are not now members of any present-day organized group. To single out any of these parties as the sole beneficiary of the award might well give it an undue advantage and work against other Indians equally entitled.

However, the use of "Plains-Ojibwa" presents difficulties not anticipated in our prior decisions. This is an anthropological term of relatively recent origin, used mainly for linguistic and not ethnological purposes. Also, as mentioned above, the Government has never dealt with an Indian group under this name. There is, therefore, a substantial danger of confusion arising from the use of "Plains-Ojibwa." The Commission has recognized this danger, and sought to meet it by explaining at some length what it meant by the term in these particular cases. Nevertheless, the novelty and uncertainty of the term, with its possibilities for extended controversy, remain troublesome, and we consider that it should be abandoned. The Chippewas who used and occupied the awarded area up to the McCumber Agreement are better described as Pembina Chippewas. The individuals who comprise the named Chippewa parties are Pembinas, and any others who may be eligible will likewise be Pembina descendants.

■ For these reasons we modify the Commission's findings and determination to this extent—the ancestral landowning entity will be denominated as the "American Pembina Chippewa group (full and mixed bloods), including the subgroups of the Turtle Mountain Band, the Pembina Band, and the Little Shell Bands." [33] *Cf.* United States v. Northern Paiute Nation, 393 F.2d 786, 791–792, 183 Ct.Cl. 321, 330–332 (1968); Cherokee Freedmen v. United States, 195 Ct.Cl. 39, 52 (1971). This title, although somewhat ungainly, accomplishes the purpose of excluding those not in interest, and including all with colorable claims. Also, by casting an award, if any, in terms of a defined body of Chippewa Indians, the unfamiliarity and possible ambiguity latent in "Plains-Ojibwa" is avoided. Further delineation of

---

33. We include all three plaintiff bands by name because we understand the Commission to have found, upon substantial evidence, that all three groups have at the very least a "colorable claim" to the award area, and so should be permitted to petition Congress or the Secretary of the Interior for participation in any award. Cherokee Freedmen v. United States, 195 Ct.Cl. 39, 48 (1971).

those to whom any award should go is, as we have held, a matter for the authorized administrative official or for Congress. *See* Public Law 93–134, Act of October 19, 1973, 87 Stat. 466.

## V

The Turtle Mountain and Pembina Bands assign error to the Commission's permitting of the Little Shell Bands to participate in this proceeding. On the basis of the evidence, the Commission found:

> Plaintiffs in Dockets 191 and 221 claim to be successors to the interests of Little Shell and his followers. Little Shell and his followers left the negotiations with the McCumber Commission and refused to sign the McCumber Agreement. We find that these plaintiffs together constitute an identifiable group of American Indians, many of whose members are descendants of Chief Little Shell and his followers. 23 Ind.Cl.Comm. 315, 327 (1970).

Section 10 of the Claims Commission Act, 25 U.S.C. § 70i, requires that all claims be brought by or on behalf of a "tribe, band, or other identifiable group of Indians." Numerous decisions of this court, beginning with Thompson v. United States, 122 Ct.Cl. 348, 357 (1952), have dealt with the meaning of "identifiable group" as it relates to who may bring a claim. *See, e. g.,* McGhee v. Creek Nation (United States), 122 Ct.Cl. 380 (1952); Red Lake and Pembina Bands v. Turtle Mountain Band of Chippewa Indians (United States), 355 F.2d 936, 173 Ct.Cl. 928 (1965); Snoqualmie Tribe v. United States, 372 F.2d 951, 178 Ct.Cl. 570 (1967). That line of precedent has established the right of descendants of an ancestral entity to file suit:

> [I]f a group presenting a claim under the Act is capable of being identified as a group of Indians consisting of the descendants of members of the tribes or bands which existed at the time the claim arose, the jurisdictional requirements of the statute, in our opinion, have been met. McGhee v. Creek Nation (United States), *supra,* 122 Ct.Cl. at 391.

This is what the Commission found as to the Little Shells who, like the members of the appellant Chippewa bands, are descendants of Pembinas. *See* note 33, *supra.*

In attacking this holding, the Turtle Mountain Band first attempts to swallow the Little Shells by contending that most, or the great majority, are Turtle Mountain members. But we do not understand the Turtle Mountain Band to concede that all of the Little Shell Bands are Turtle Mountain members, and the Little Shells deny that that is so. This being the case, we cannot mechanically conclude that the Little Shell petitioners are barred from separate representation.[34]

The Turtle Mountain Band also argues that the activities of Little Shell and his followers, in 1892 and thereafter, were sufficient only to make them a dissident faction, and were not of adequate kind or quality to transform the alleged faction into a band or other identifiable entity. The argument continues that, since the ancestral Little Shell Band was only a "faction," the present Little Shell petitioners cannot bring their claim on behalf thereof, and that therefore the Act gives the organized Turtle Mountain Band the sole right of representation of all who were Turtle Mountain Indians.[35]

34. Fear that there might be double recovery by those Indians who are members of both bands is too premature and speculative for consideration at this stage. There clearly are ways to prevent double recovery by individual Indians.

35. Section 10 of the Act provides the following exception to the rule that any member of an Indian group may bring a claim on behalf of the group; " * * * but wherever any tribal organization exists, recognized by the Secretary of the Interior as having authority to represent such tribe, band, or group, such organization shall be accorded the exclusive privilege of representing such Indians, unless fraud, collusion, or laches on the part of such organization

■■■ But the Little Shell Chippewas need not have formed a separate band or other organized entity in the 1892–1905 period in order that an identifiable group of their descendants may bring this claim separately. Since the Commission allowably found that the ancestral Turtle Mountain Band divided because of Little Shell's protest against the McCumber negotiations, and since the present Turtle Mountain Band does not claim to represent all of the present Little Shell members, the latter group is entitled to separate representation as a claimant on behalf of the original Turtle Mountain Band.[36] As we held in *McGhee*, the ancestral group "owns" the claim, and present-day Indian groups are before the Commission only on behalf of the ancestral entity. 122 Ct.Cl. at 386–388. The conclusion reached in *McGhee* is that an officially organized group of descendants of the ancestral entity, and an identifiable, but unorganized group of descendants, are both entitled to separate representation in proceedings before the Commission. *Id.* *See also* Cherokee Freedmen v. United States, 195 Ct.Cl. 39, 45 (1971). This principle is controlling here and authorized the separate participation by the Little Shell plaintiffs whom the Commission could permissibly deem, in view of the band's genesis and history, as an "identifiable group."

Nor does the exception in section 10 of the Indian Claims Commission Act, note 35, *supra,* for tribal organizations recognized by the Secretary of the Interior help the Turtle Mountain position. The exclusive right granted to such an organization extends only to the representation of its own members. The Little Shell petitioners claim to represent only the dissident group which split off during the McCumber negotiations. It would be different if all Little Shells were now Turtle Mountain Band members also, but this has not been asserted or shown. Since the participants in the Little Shell Bands are not wholly included in the membership of the present-day Turtle Mountain Band, the Little Shells are entitled to separate representation before the Commission. There was no error in allowing them to proceed as a claiming party.

On these grounds, we affirm the orders and determinations of the Indian Claims Commission, insofar as appealed from, in every respect except as to the name of the ancestral landowner. In place of the term used by the Commission, we substitute the designation set forth at the conclusion of Part IV of this opinion.

Modified and affirmed.

---

be shown to the satisfaction of the Commission." 25 U.S.C. § 70i.

36. Indeed, the Little Shell Bands need not go this far; it is enough to warrant separate representation if the Little Shell group brings its claim on behalf of the Indian group having aboriginal title to the area in question, whether or not that group is the original Turtle Mountain Band.